CARROLL et al. v. CITY OF NEW YORK.

CITY OF NEW YORK v. CARROLL et al.

(Circuit Court of Appeals, Second Circuit. January 16, 1918.)

Nos. 133, 134.

1. COLLISION ⬅123—LIABILITY—BURDEN OF PROOF.

A vessel, proceeding in violation of statutory requirements at the time of a collision, to escape liability, must show such violation did not contribute to the collision.

2. COLLISION ⬅93—LIABILITY—FERRY.

While a ferryboat's occupation imposes additional duties upon vessels pursuing their lawful occasions near ferry slips, yet liability must be determined by the ordinary rules of navigation, where a collision between a ferryboat and another craft occurred 800 feet beyond the end of the ferry slip.

3. COLLISION ⬅102—LIGHTS—LOOKOUTS—LIABILITY.

A ferryboat and propeller, which collided, the former being struck on the starboard side, *held* both liable; the ferryboat for not promptly observing the propeller's lights, it having the right of way under the starboard hand rule, and the propeller in violating statutory requirements as to speed and keeping to the middle of the channel. So the damages should be divided.

Appeals from the District Court of the United States for the Southern District of New York.

Libel by Howard Carroll and another, executors of the estate of John H. Starin, deceased owner of the steamboat Haven, against the City of New York, together with a libel by such respondent against such libelants. From decrees for the City of New York, Howard Carroll and another appeal. Reversed and remanded, with directions.

A few only of the facts regarding this collision need statement as a basis for legal ruling:

On a dark clear night, in the East River, with the tide strong flood, and a northwesterly gale, the ferryboat Queens, bound from her slip near the foot of Whitehall street to Staten Island, came in collision with the propeller Haven, bound from a North River pier into the Sound and so on to New Haven. The blow (nearly amidship) was by the bow of the Haven on the starboard side of the Queens, and not over three points (probably less) off a right angle: contact occurred about 800 feet off the end of the ferry racks, in a line between one of the Whitehall slips and the nearest wharf on Governor's Island, a distance of between 2,200 and 2,300 feet. Before collision the Queens had probably been carried by tide and wind broadside, or nearly so, somewhat to her own port hand.

On getting under way and blowing her slip whistle, the Queens noticed three tows, all on her port bow, all going out of the East River, and all on the Manhattan side of the channel. The estimated distance of the outside tow from the rack or pier ends was 600 feet. While such estimates are not at all reliable, it is found and admitted that all these tows were inside of or nearer Manhattan than the course of the Haven, which as found by the court below was to keep substantially the same distance; i. e., about 800 feet off the Battery, as she rounded into the East River.

The Queens blew one whistle, at least twice, to the tows on her port bow, and received assenting answers. She denies (and we so assume) that she ever blew any passing signal to the Haven, which vessel, however, gave one whistle, on the assumption that one of the Queens' signal blasts was intended for her.

The Haven had seen the Queens in, or just leaving, her slip, and when the propeller was passing the Aquarium, a distance of about 2,000 feet; the Queens did not notice the Haven until she was distant no more (by the ferryboat's testimony) than 1,000 feet. Again accuracy is not to be expected in this matter of distance; but we find as a fact, on the Queens' own evidence, that she paid no attention to the Haven, if indeed she saw her, until after the Queens had cleared the tows to her own port, and she was then almost across the Haven's path, although the red light of that vessel must have been plainly visible from the time she was about off the Aquarium. On this point no finding was made below.

The Haven was found at fault for violating the East River statute, both as to speed and proximity to the shore, and no contributing error was discovered in the Queens. Decrees accordingly having been entered, the owners of the Haven appealed.

Macklin, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for the Haven.

Kirlin, Woolsey & Hickox, of New York City (William H. Mc-Grann and Robert S. Erskine, both of New York City, of counsel), for the Queens.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] The findings below, to the effect that the Haven was exceeding the speed limit and not keeping in the middle of the channel, are supported by evidence, and we acquiesce in them. There was a violation of statutory requirements, and the burden of showing that such violation did not contribute to collision has not been borne; therefore the Haven must be held to liability.

[2, 3] The conduct of the Queens is sought to be justified under The Breakwater, 155 U. S. 252, 15 Sup. Ct. 99, 39 L. Ed. 139. That case does not mean nor say that a ferryboat's occupation completely frees her from the rules of navigation. It does impose additional duties upon all vessels pursuing their lawful occasions near ferry slips. What shall be the space or region, or the extent thereof, within which these duties are obligatory, is a matter of degree, depending on local and sometimes temporary conditions.

We held in The Paunpeck, 86 Fed. 924, 30 C. C. A. 494, that a ferryboat, colliding with another vessel 800 feet from her slip end, was to be acquitted or condemned by the usual navigating rules. That decision is applicable here; in both cases the conditions are those reasonably to be expected in the transaction of maritime business in the crowded waters of New York Harbor. Therefore the starboard hand rule applied, and the Haven had the right of way. That vessels might be approaching on her starboard bow, to which she must give way, was just as much to be expected by the Queens, as that others would appear to her port.

No reason at all is shown by the ferryboat why she did not see and navigate with reference to the Haven before she did. There is a suggestion—it is far from proof—that the propeller's light was not good; but there is no denial that navigation with reference to the Haven began when just clear of, or just clearing, the outermost tow. That was too late; collision was imminent. It is urged in excuse

that the gale and tide rendered it impossible for the Queens, a large boat of great freeboard, to turn in time to pass under the Haven's stern or pass her port to port. That may be true, but its truth would have been just as apparent, had the ferryboat seen the propeller and signaled her earlier. As it happened, nothing was done but to blow the danger whistles, when the Queens was practically across the bows of the privileged vessel. Probably, when those whistles were blown, nothing could be done; but no man is excused from the result of an unlawful situation, if he is not also excusable for getting into it. This last is the excuse lacked by the Queens; if she had seen and noted the Haven at the proper time, i. e., substantially when the Haven saw her, we do not think collision would have ensued; at all events the Queens has not shown the contrary, and thereby avoided the result of a fault on her part, as obvious as that of the Haven.

Holding, therefore, the Haven at fault, as found below, and the Queens also negligent, in that (1) she did not timely observe a situation to which (2) the starboard hand rule applied, the decrees below are reversed, with one bill of costs to appellants, and the causes remanded, with directions to enter decrees dividing the damages and lower court costs.