## CLYDE S. S. CO. v. UNITED STATES.

Circuit Court of Appeals, Second Circuit.
July 2, 1928.

No. 342.

1. Collision ⬤⟝73—Drifting vessel, colliding with anchored vessel, has burden of showing she was not at fault.

Vessel drifting down and colliding with an anchored vessel has burden of showing she was not at fault in such collision.

2. Collision ⬤⟝71(2)—Drifting vessel in charge of inexperienced officer during storm, with insufficient anchor cable, held solely at fault in collision with anchored vessel.

Vessel left in charge of inexperienced officer during storm, with insufficient anchor cable, held solely at fault in resulting collision with anchored vessel after drifting some distance.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Clyde Steamship Company, as owner of steamship Comanche, against the United States, owner of United States destroyer McCall and United States battleship Indiana, to recover damages sustained by libelant's vessel. Decree dismissing the libel, and libelant appeals. Reversed.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for appellant.

Charles H. Tuttle, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. This libel is filed pursuant to a special act of Congress passed for the relief of the appellant on February 16, 1925. On December 13, 1917, at about 9 p. m., the destroyer McCall dropped her anchor in 14 fathoms of water below the Narrows in New York Harbor and near the center of the channel. The wind was east or northeast, with a force of about 23 to 28 miles an hour. She was lying to 60 fathoms of chain, which is about 4 feet of chain to one foot of water, although she had 120 fathoms available on both port and starboard anchors. Her commander feared bad weather and had steam up for an emergency, but nevertheless turned in about 11:30 p. m. without paying out more chain on the port anchor or dropping the starboard anchor, and left an inexperienced naval lieutenant in charge without instructions.

The Comanche was bound into New York from Jacksonville, and because of a blinding snowstorm, and that the Narrows was crowded with anchored vessels, her master decided to anchor, and after three attempts did so at about 10:30 p. m. in Gravesend Bay, anchoring off Northern Point in about 30 feet of water, using 60 fathoms of chain. The tide

was ebb. No other vessels were visible, due to the snowstorm, when the Comanche anchored. She kept up a full head of steam, and the starboard anchor was ready to let go in an emergency. Regulation anchor lights were set and a lookout was stationed forward. At proper intervals the fog bell was rung. The master and second officer remained on deck with a watchman patroling. An engineer and fireman were kept on watch in the fire room. The barometer was very low. In about half an hour after the Comanche anchored, the weather cleared somewhat and the master observed the battleship Indiana about 500 feet off on the starboard beam and a tramp steamer on the port beam. Bearings were taken at midnight and making allowances for the swing, the bearings remained the same. At about 2:30 a. m. the wind shifted to N. W. Bearings were again taken, and, making allowance for swinging to head to the changed wind, the bearings remained the same. At 2:40 a. m. the wind increased to 52 miles an hour, and in 15 minutes more to 85 miles; falling snow shut out shore lights.

The McCall dragged her anchor, collided with the Comanche, and hung across her stem for several minutes, and then broke around on the Comanche's starboard side, and then she lay alongside the Comanche starboard to starboard for some minutes, and passed down between the Comanche's stern and the Indiana's bow. This additional strain broke out the Comanche's anchor, and caused the Comanche to drag, so that, when the McCall cleared, the Comanche was drifting toward the Indiana and was so close to her that the Comanche could not use her engines in time to avoid a collision with the Indiana. The Comanche's anchor chain fouled the Indiana's anchor chain, and in order to avoid serious damage from the Indiana the Comanche let out all the chain on her port anchor and lay alongside the Indiana's port side until daylight, when they were freed and the Comanche proceeded to her pier in the North River. The Indiana did not pay out chain, nor were her engines maneuvered to avoid the collision. She had steam up and her watch officer admitted that he observed what was happening.

[1] Since the McCall drifted down and collided with the Comanche, an anchored vessel, the burden is upon her to show that she was not at fault. The Virginia Ehrman, 97 U. S. 309, 24 L. Ed. 890; Job H. Jackson (D. C.) 144 F. 896, affirmed (C. C. A.) 152 F. 1021. A fault charged against the McCall, and fully sustained, is her failure to have out sufficient chain or to put out more chain as the occasion required. Admiral Knight, in his work on Modern Seamanship (7th Ed.), points out that under ordinary circumstances a length of cable equal to seven times the depth of water is required. And he says: "This is perhaps enough for a ship riding steadily and without any great tension on her cable, but it should be promptly increased if, for any reason she begins to jump or shear about; for it is always easier to prevent an anchor from dragging than to make it hold after it has once begun to drag."

And he explains further: "If the length and weight of the chain are such that any part of it rests upon the bottom, then the weight of that part is added to the weight of the anchor, and helps in this way to hold the ship. It has been found, however, that in the case of a ship riding to a moderate gale in ten fathoms of water and with 100 fathoms of chain, not a single link of chain rests undisturbed upon the bottom. * * * It is only in the two ways above described that a long scope is of value to a ship which is pulling steadily at her cable; but the moment she begins to shear about, or to rise and fall in a seaway—alternately, ranging up toward her anchor, then driving heavily back upon her cable—the value of the long scope makes itself felt in the elasticity of the bight, which prevents the rapidly varying tensions from being thrown upon the cable and the anchor in a succession of violent shocks."

He also points out at page 253 that in riding out a gale it may often be necessary to let go a second anchor, but there can be no question that, where unlimited space is available, a ship is safer and easier with a single anchor and a long scope of chain, and by a long scope is not meant 60 fathoms, but twice that length, or even more.

During the night, no tests of the anchor were made by the lieutenant left in charge. Such tests might have been made by feeling the chain. She had plenty of room in which to pay out more chain. In The Forde, 262 F. 127, we held a vessel where, on this night, in the same storm, the master went to bed early, leaving as sole anchor watch a landsman, who was inexperienced, and where the vessel dragged her anchor and collided with another. In the British Isles, 264 F. 318, we said that this storm was to be expected hours before it came. In Newport (C. C. A.) 15 F.(2d) 342, 1928 A. M. C. 740, a ship was condemned for leaving an inexperienced officer in charge when approaching another

ship at sea 20 minutes before a collision, when the master left the bridge. Under the weather conditions that existed this night, a master, anchoring in such crowded waters, was in duty bound to exercise seasonable precautions to prevent every possible disaster.

It is no defense to attempt to prove later that nothing could be done at the moment to prevent the disaster because of the storm, or to say that precautionary measures were not perceived until it was too late to render them availing. The Teutonia, 23 Wall. 77, 23 L. Ed. 44. Good seamanship required complying with the familiar rule as to the length of chain to be used and a constant watch of the chain while the ship was riding out this storm. To place a man on watch who was inexperienced, and who admits he made no tests, and perhaps knew little of the number of feet of chain which had been payed out, was not a compliance with the duty imposed upon the McCall.

[2] The McCall anchored 270 yards on the Craven Shoal Gas Buoy bearing 250°. Before it was ascertained that she was drifting, she was practically in collision with the Comanche, which was anchored at the northeast point about a mile distant. No bearings were taken while there was visibility, and no effort was made when the weather had cleared somewhat, whether the anchor was dragging by feeling the chain. Such lack of care makes her blameworthy. The British Isles, supra. The defense of unavoidable accident has not been established. The McCall has failed to bear the burden of explanation, for she did not do those things which she could have, and, by so doing, would have avoided the consequences.

The case differs from The Ocmulgee, 1925 A. M. C. 302; The Asmund, 1925 A. M. C. 299; B., O. & O. R. Co. v. Pennsylvania Railroad Co., 1925 A. M. C. 926; The Lighter Japan, 1925 A. M. C. 931; The Almora, 1925 A. M. C. 939, where good lines were made fast and all reasonable precautions were taken, but due to unusual storms the vessels broke loose. The McCall, fouling the chain of Comanche, caused the collision with the Indiana. The Gulf of Mexico (C. C. A.) 281 F. 77. The Comanche kept proper anchor watch and cannot be held at fault. The failure of the McCall sufficiently explains the cause of the damage, and her owner alone will be held. The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943; The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84.

Decree reversed.