Mrs. Edith BOUDOIN et al., Appellants,

v.

J. RAY McDERMOTT & COMPANY,
Inc., Appellee.

No. 18175.

United States Court of Appeals
Fifth Circuit.

July 18, 1960.

J. B. Jones, Jr., Cameron, La., Jones & Jones, Cameron, La., for appellants.

Francis Emmett, New Orleans, La., Faris, Leake & Emmett, New Orleans, La., Warren M. Faris, New Orleans, La., of counsel, for appellee.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

For Louisiana diversity cases this term we have been confronted with several of nature's perils. In Lussan v. Grain Dealers Mutual Ins. Co., 5 Cir., 1960, 280 F.2d 491, fear by one of a little insect—a bee or a wasp—capable of doing limited harm, brought about injuries to another. Here we deal with the opposite extreme. Hurricane Audrey of June 27, 1957, having the capacity for devastation was known to be off the Louisiana Coast. Yet lack of fear—born perhaps by natural optimistic confidence or inadequate timely information—may have led many to remain in the very path of destruction. Absence of fear, or in some cases perhaps an indifference to it, in a general nonlegal sense brought about the loss of 353 lives and the destruction of movable properties worth millions of dollars.

Our precise problem is to determine whether the District Court was correct in denying recovery for severe damage to a dock caused when it was struck by a large ocean-going barge after she broke her moorings, was lifted by the tide and carried a mile over land then flooded by the storm.

As this was such a devastating catastrophe and there is or may yet be litigation growing out of it, we think it especially necessary to sound the caveat here that we are dealing with this record and this record only. What we have to say is not meant as an estimate by us on factual conclusions or legal principles which would apply to the whole occurrence.

■ In our approach we adopt all of the factual holdings of the District Judge. While reaching a conclusion contrary to his, we do not reject evidence credited by him. Our difference relates to the inferences which could properly be drawn from testimony which is largely uncontradicted. Since the important function of a trial judge is the drawing of inferences, frequently from so-called undisputed or uncontradicted evidentiary facts, we may not approach this merely as an independent choice by us of inferences we deem preferable. Ohio Barge Line v. Oil Transport Co., 5 Cir., 1960, 280 F.2d 448. In applying the clearly erroneous concept of F.R.Civ.P. 52(a), 28 U.S.C.A., our approach here is to show how the inferences drawn by the trial court have insufficient basis to serve as a denial of recovery.

The damaged dock was in the village of Cameron, Louisiana. Hurricane Audrey struck in the early morning of Thursday, June 27, 1957. Winds of over 100 mph, driving rain and a storm tide of over 10 feet above mean sea level killed 353 persons and inflicted property damage in the hundreds of millions of dollars. All acknowledge that once Audrey hit, there was nothing that could then be done. Liability, if it exists, must turn on whether the barge causing the damage ought ever to have been in that predicament. This takes us back to the preceding days of Tuesday, June 25, and Wednesday, June 26.

The barge, the unmanned Tidelands 5, with a length of 272 feet, a beam of 72 feet, and 15 feet in depth, was drawing about 3 feet. Her deck load of drilling equipment weighed about 750 tons. In the early afternoon of Tuesday, June 25, while at sea off Sabine Pass and in tow of the tug, R. Thomas McDermott, then bound for McDermott's base at Bayou Boeuf, the Tug received directions from McDermott's shore-based dispatcher. The head office passed the word of the Hurricane Watch [1] posted by the U.S.

1. The U.S. Weather Bureau's report, stipulated in evidence by both parties, defines these terms which are of some importance:

Hurricane Watch: "An announcement for specific areas that a hurricane or incipient hurricane condition * * * poses a threat."

Hurricane Warning: "A warning that hurricane winds of 75 mph or higher or dangerously high water or rough seas are expected in the specified areas."

Weather Bureau Advisory No. 1. The tropical disturbance was nearly due south of Lake Charles, Louisiana, and 380 miles SE of Brownsville, Texas. McDermott's shore-base instructed the tug to take the Tidelands 5 in to Cameron and moor her at the McDermott-Phillips dock. The captain, a young 25-year-old practical tug master but without any marine license, immediately complied. The barge was made fast to Phillips dock about 6:00 p. m. Tuesday, June 25.

The tug had ample means of communication by radio telephone through official government, public and private channels. It was stipulated that the tug had received all of the Weather Bureau Advisories and Bulletins, but the captain's recollection of them or their sequence left much to be desired. In any case, the air was soon crackling with messages. By 12:00 noon on Tuesday, June 25, the tropical disturbance had been classed as a hurricane and was officially baptized as Audrey. Advisory No. 2 at 4:00 p. m. that afternoon reported Audrey coming northbound. It predicted "highest winds are estimated at about 100 mph near the center * * *." After stating that Audrey would drift northward "and increase in size" the first of many express warnings was sounded about storm tides. "Tides are expected to rise and seas will become rough along the Texas and Louisiana Coasts tonight and Wednesday * * *. Ships in the path of this hurricane should exercise caution."

Advisory No. 3 at 10:00 p. m. Tuesday, June 25, continued the Hurricane Watch. It reported " * * * Audrey is increasing in size" and "is moving slowly northward." Positions given in relation to previous Advisories showed that she was moving straight toward the Texas-Louisiana Coastline. Her position was due south of Lake Charles at a point about 500 miles distant from New Orleans. It predicted a slight change from N to NNE Wednesday.

Now it was Wednesday, June 26. But things were getting no better as Advisory No. 4 issued at 4:00 a. m. Wednes-

day, June 26, revealed. The "Hurricane Watch" described "the greatest threat to the Louisiana Coast." It reported "Audrey continues to increase in size * * * highest winds are estimated 100 mph near the center * * *." A specific warning was then given of tidal action and the area of danger. "Small craft along the Texas and Louisiana coast should remain in port as seas and tides are beginning to increase." Of critical importance this was followed by something more specific, "tides are expected to be 2 to 3 feet above normal from the Mississippi Sound to the upper Texas Coast tonight and continue rising Thursday."

Came the dawn on Wednesday, June 26. For those who would listen, and listening would heed, things were getting no better fast. Of importance, at least to those who go down to the sea in ships, was the technical change in the Weather Bureau Reports. Advisory No. 5 at 10:-00 a. m. now changed it from a Hurricane Watch to a "Hoist Hurricane Warning * * * along entire Louisiana coast * * *." Audrey's reported position was further north but still on a bee-line for Lake Charles. A slight change to east of north was predicted. The tidal situation was markedly worse even in the few hours since the previous Advisory at 4:00 a. m. It now warned "tides are rising and will reach 5 to 8 feet along the Louisiana coast and over the Mississippi Sound by late * * *." True it fixed the probable time as being "by late Thursday." But coupled with it was the warning many times repeated and too little heeded that "all persons in low exposed places should move to higher ground."

Things were no better, only worse, at 4:00 p. m. when Advisory No. 5 continued the Hurricane Warning for the Louisiana coast while describing all other areas from Galveston to Pensacola as storm warning only. Audrey was positioned "about 300 miles south of Lake Charles" with "indications * * * for continued northward movement at about 10 mph." The center was estimated to

reach "west or central Louisiana coast late Thursday." The tidal warning was again emphasized. "Tides are rising and will reach 5 to 8 feet along the Louisiana coast and over the Mississippi Sound * * *. All persons in low exposed places should move to higher ground."

On Wednesday evening at 7:00 p. m. a Bulletin was issued. At 10:00 p. m. Advisory No. 7 was released followed by a Bulletin at 1:00 a. m. Advisory No. 8 was issued at 4:00 a. m. on Thursday, June 27. We need not detail them since there is no basis for suggesting that after 7:00 p. m. on Wednesday, June 26, the Tidelands 5 could have done very much. As a matter of interest the zero hour for Audrey's striking the coast was moved ahead from "late Thursday" (10:00 p. m. Wednesday) to "before noon today (Thursday)" (1:00 a. m. Thursday). Likewise the height of storm tide was increased from "5 to 8 feet" (4:00 p. m. and 7:00 p. m. Wednesday) to "5 to 9 feet" (10:00 p. m. Wednesday; 1:00 a. m. Thursday). The area of storm tide previously defined "along the Louisiana coast" was narrowed "from High Island, Texas to Morgan City, Louisiana" (10:-00 p. m. Wednesday).

 Before analyzing other evidence which bears upon the prudence of those in charge of the Tidelands 5, we think the District Judge in his assessment of conduct was erroneously influenced by two factors. The first was an undue emphasis upon our prior decision in United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 1956 AMC 745. The second was the fact that so many, to their great sorrow and that of their families, remained in Cameron. Consequently, what the captain did must have been prudent since so many others had done likewise.

The first (Vela) was an application in vivid circumstances, and perhaps like language, of the principle that where, without prior negligence, a vessel is put in the very center of destructive natural forces and a hard choice between competing courses must immediately be made, the law requires that there be something more than mere mistake of judgment by the master in that decision *in extremis*. That would certainly cover the steps taken by the Tug R. Thomas McDermott and the Tidelands 5 as the fury of Audrey first made herself felt in the early hours of Thursday, June 27. With the hurricane wind-driven storm tide raising and pushing the Tidelands 5, the tug attempted to counteract these forces by pulling full ahead on a line into the teeth of the wind. When it became evident that this was risky to tug and all hands aboard her, the line was deliberately cut and almost immediately the Tidelands 5 started her one mile journey across the mud flats of Monkey Island. But as we shall discuss in more detail, no such pressing emergency confronted the master during the late morning and afternoon of Wednesday, June 26. He had time and facilities to form relative judgments. The trouble is that this record affords no basis for concluding that he ever evaluated any of these things until the evening of Wednesday, June 26. At the time of the 10:00 p. m. Advisory all agreed that it would have been foolhardy, if not impossible, to set out in the dark for an unknown haven.

The second is simply an impermissible standard. That is to say, what the ordinary prudent shipmaster would do under the circumstances existing on Wednesday, June 26, is not to be measured by what hundreds or even thousands of ordinary persons—housewives, children, laborers, salesmen, and the like—either did or ought to have done. There are several reasons—if such a self-evident thing must be articulated. First, it is the nature of the calling of the shipmaster to know of the tempestuous forces of wind and tide and seas. He has to make assessments often from confusing or inadequate facts and then translate them into effective decisions. He cannot, therefore, trust to some providential intuition. He must be informed and experienced in the critical evaluation of data. Hence, he may not justify an erroneous judgment merely because others not similarly trained or charged with re-

sponsibility reached a like conclusion. Second, he has under his command a thing which may be the instrument of further damage—here a large cumbersome, unmanned, unwieldy craft which, once loosed before these forces, would smash all in her path. He has, therefore, a special duty to take all reasonable steps consistent with safety to his ship and her crew, to avoid or minimize the chance of harm to others. These two supporting reasons (and others) combined to make it essential that the tug captain's action of Wednesday, June 26, be tested as that required of a prudent shipmaster.

Since the cause of the barge breaking loose was the storm tide, this factual inquiry concerning prudence of the tug master has to reckon primarily with that. This makes important the location and nature of the dock to which Tidelands 5 sought sanctuary. To be sure it was a stout one, probably one of the finest and newest in the area, and its mooring pilings did not give way. But overemphasis by Tidelands 5 of those factors as well as the number of strong mooring lines put out, none of which parted, obscures the facts so critical here. The Phillips-McDermott dock was but a mile and a half from the open Gulf of Mexico. It was located on the north bank of the Calcasieu River as it made a horseshoe bend to the east then back to the west. It was substantially one mile due south of the plaintiff's dock but separated by Monkey Island. But the land between the Gulf and Phillips dock and between Phillips dock and the village of Cameron is flat, low country, barely above sea level.

The tug captain was therefore compelled to realize that if storm tides of any substantial height occurred, this dock was not a safe place to remain. The margin in feet was very restricted. The upper edge of the Phillips dock was not over three feet above the level of the river which for all practical purposes was sea level. The draft of the barge was 2 to 3 feet. Consequently, a rise of 6 feet in the tide would lift the barge above the dock. Obviously, once the dock afforded

no resistance to the barge, no conceivable set of line could possibly have held this large barge with its extensive areas of exposure against winds of 100 mph or, worse, storm tides driven by such winds coming from the open sea.

On what basis can the tug master claim ignorance of such a likelihood? Beginning with Advisory No. 2 (4:00 p. m. Tuesday, June 25), he knew that "tides are expected to rise." By 10:00 p. m. Tuesday night (Advisory No. 3) the prediction was more imperative, "seas and tides will increase along the Louisiana and Texas coasts." By 4:00 a. m. Wednesday, June 26, (Advisory No. 4) the Warning was even more specific. "Tides are expected to be 2 to 3 feet above normal * * * and continue rising Thursday." And by 10:00 a. m. Wednesday, June 26 (Advisory No. 5), the Warning was emphatic and positive in predicting tides that will exceed the critical 6-foot margin open to the Tidelands 5. "Tides are rising and will reach 5 to 8 feet along the Louisiana coast * * *." And this was repeated in Advisory No. 6 at 4:00 p. m. Wednesday, June 26. As early as 10:00 a. m. Wednesday, June 26, this tug master knew that Hurricane Audrey would produce storm tides of 5 to 8 feet. This, he knew, would inundate the whole mud flat area and once it did so, it would leave his barge afloat and at the mercy of a cruel and violent sea.

■ That left only two unknowns— *where* would she strike? and *when* would she strike? Since a competent shipmaster must evaluate data continuously, he can certainly claim no surprise on *where* it would strike. Advisory No. 1 (June 25) fixed the fetal position of Audrey near Latitude 22.5, Longitude 93. Each subsequent report showed Audrey moving northward. Her position at 4:00 a. m. Wednesday, June 26, was 24.2-93.4, and at 10:00 a. m. at 25.1-93.3. She was heading right for the Louisiana-Texas boundary scarcely 40 miles to the west of Cameron. A chart, a pencil, and a ruler if used would have taught him that unless things changed, his ship was right

in Audrey's path. But he did not have to be even this methodical. All he had to do was listen since every Advisory warned that Audrey would likely strike the Louisiana coast. And by 4:00 p. m. Wednesday, June 26, this was even narrowed further to "west or central Louisiana coast."

■ On the question of *when*, it is not nearly so clear. Indeed, the prediction that she would hit "late Thursday" was wrong. This advice was continued up through 10:00 p. m. Advisory No. 7 Wednesday, June 26. It was not until the 1:00 a. m. Bulletin on Thursday, June 27, that this was changed to "before noon today." But here again we are not assaying conduct of those unfamiliar with the sea and hurricanes or having no positive duty save to themselves. We are dealing with a shipmaster who had an obligation to take reasonable care that his vessel not cause damage in the impending storm. Nor are we, for that matter, dealing with such a shipmaster who merely misjudged in point of time. That might have been the case had the tug master on Wednesday afternoon made a decision to leave at daybreak on Thursday, June 27. Here there is not even any showing that the tug master made a critical evaluation of relative courses of action in point of time. He was content for his ship to remain where she was. About the only excuse he offered was that he did not expect the tides to be as high or the storm as great.[2] Crediting everything he stated in his deposition

the tug master was not misled as to time. He was not, nor does he claim to have been, in that large group of people who were planning to leave but who counted on the "late Thursday" zero hour.

Despite all of these evident record deficiencies in the affirmative explanation offered by the tug captain, the Court was not left unaided as to what would constitute prudent seamanship. A number of witnesses were offered on this. Two experienced tug and ship masters, former or current Louisiana Bar pilots, were unshaken in their professional expert opinion that in the face of these Advisories the Phillips dock was not a safe place for the Tidelands 5. The likelihood of high storm tides, reported all day Wednesday, striking this exposed mooring place made withdrawal from that area imperative in their judgment. The prudent course was to proceed up the Calcasieu River to Lake Charles some fifty miles to the north. Several suitable protective anchorage spots below Lake Charles were indicated by one of the pilots and both agreed the Port of Lake Charles offered substantial protection. The intervening land mass of high elevation, protection by banks and trees from the wind would eliminate the danger from the impending storm tides. The evidence also showed that it was just such factors that led a number of vessels to proceed to Lake Charles on the afternoon of Wednesday, June 26. Indeed, while there was widespread damage to little boats remaining in Cameron, only

2. The captain testified by deposition:
 "Q. When did you first realize or become aware that the hurricane was going to hit the Cameron area? A. Well, it was late on the evening of the 26th, before I really realized it was going to come in this area here.
 \* \* \* \* \* \*
 "Q. On the evening of the 26th of June, when you realized that the hurricane was likely to strike the Cameron area, why didn't you attempt to move the R. Thomas McDermott and that tow from that area? A. Well, a number of reasons, was the reason I didn't; for one thing, I thought I was just as safe where I was at, I didn't know, I thought I

was at a good dock and I was safe, and then, if I had proceeded up that channel with that thing in tow and that storm would have caught me between there and Lake Charles, well, I would have really been in trouble, I would have probably lost my boat and my crew. And also then, if I had got to Lake Charles, I don't know where I would have tied up, I might have been in worse shape up there than I was down here, so I figured myself, I was in a good place, the reason I didn't move.
 "Q. Why didn't you move before that time? A. Well, I didn't know where the thing was going to come in shore at."

about three larger vessels in any way comparable to Tidelands 5 or the Tug R. Thomas McDermott remained.

 Of course the difficulty in this sort of case is the impossibility of determining even in retrospect whether this would have avoided plaintiff's loss or might have exposed the Tidelands 5 and tug to considerably more damage. It is complicated by the fact that this whole area in the vicinity of Cameron was devastated and extensive damage was done by the hurricane winds in the Lake Charles area. But the first goes merely to the question of damage proximately caused by the Tidelands 5, an issue expressly reserved for later trial. The dock owner will have the burden of showing damage proximately caused, and this will exclude, of course, damage which in all probability would have been sustained had not the Tidelands 5 hit the dock.[3] The second relates to probable damage to the Tidelands 5 and the tug. But once it is authoritatively determined that prudence required the Tidelands 5 to withdraw from Phillips dock in the afternoon of Wednesday, June 26, there is no showing on this record whatsoever that such a maneuver was either impossible or fraught with any distinguishable danger. On the contrary, the proof was uncontradicted that the passage could be made to Lake Charles within a period of 6 to 7 hours in safety. There was uncertainty about where the barge would moor once in Lake Charles and there was, of course, always the likelihood that even there she would be damaged by winds and flying objects. But once in the area of the Port of Lake Charles, Tidelands 5 was fully protected against the storm tides.

What we are saying is that there was no real deliberate choice made by the tug master between the perils of remaining at the Phillips dock or going to Lake Charles or elsewhere during the afternoon of Wednesday, June 26. Nor would the record support a conclusion that that is why he remained. Of course, later in the evening when dark had set in, it was too late. Because of the obvious hazards to barge, tug and crew in that course, the master was then not in a position to make the choice to withdraw, not remain.

 The sum of this record leaves us with a definite conviction: Tidelands 5 put into Phillips dock because the shore base told the tug captain to take her there. Once there, the tug captain reported and he was dutifully awaiting further orders. We base that largely on the inadequacies of the tug captain's testimony taken as it was wholly by deposition. At no place does it reflect that as tug master with heavy responsibilities imposed upon him, he was undertaking consciously to make relative judgments. It was incumbent upon him to establish that he had no reason to apprehend that Audrey would strike and if she struck would cause his barge to lose her moorins and do damage to other structures. The record shows ample warning that the hurricane would hit where it hit with storm tides high enough to float the barge from her mooring. To exonerate himself in the face of that actuality, the captain was required to make a convincing showing that while that was actually so, he had reasonable grounds for thinking the truth to be otherwise. Confining ourselves to the afternoon of Wednesday, June 26, when there was yet

3. The District Judge credited the testimony of an eye witness who saw the Tidelands 5 hit the plaintiff's dock and then ride up over it where she fetched up on the submerged land. This fact conclusion is amply supported. The Judge recognized that if he found liability, some unusual problems might be presented on damages. As in nearly every catastrophe near tragedy has its moments of pathos mixed with the whimsical. So it was about this eye witness. After taking his wife and little boy to

the courthouse in the early hours of Thursday, June 27, the witness ran back to his home which he feared would be destroyed to rescue a jar of money. The storm hit and he found himself wrapped around a utility pole hanging on for dear life. How long he does not know, and the wind or the water or both tore his shoes and clothes off. From this vantage point, a short distance from the plaintiff's dock, he saw and vividly described the Tideland 5 smash the dock and come to rest apparently aground.

time for safe withdrawal, we think his explanation a complete void. With respect to this casualty, the Tidelands 5 and those in her charge are in the position of one asserting the defense of inevitable accident as that term is often used. We do not put decision or our reversal upon any technical failure to satisfy a burden of proof, as such. But the law is clear that "the burden 'is heavily upon the vessel asserting such a defense,' (the Lackawanna, C.C.A.2, 210 F. 262, 264 [1913]; Hedger v. Tug John D. Schoonmaker, · C.C.A.2, 122 F.2d 312, 1941 A.M.C. 1201, and cases cited.) Such vessels 'must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.' (L. Hand, J., in the Hylas, 1925 A.M.C. 921, 925)." Griffin, Collision § 238 at 539 (1949).[4]

Quite apart from the question of which party had the burden to prove any specific element, this record when looked at as a composite whole does not satisfy these standards. It fails completely to show that the captain of the tug exercised any critical evaluation of the data being received by him throughout Wednesday, June 26. The barge Tidelands 5 remained where she was moored not because any choice was made but because that is where she was left. An act of God—which Audrey surely was—would, of course, exonerate a vessel once she struck. But the price of that defense was a creditable showing, or at least a composite record of evidence, allowing the persuasive conclusion that in the comparative calm of Wednesday, June 26, the tug master had no reason to anticipate that Audrey would strike with the fury which she had and where the Tidelands 5 was moored. This record will not justify that conclusion. Indeed, we do not think the District Judge so found. In its absence the law attached the consequence of liability for whatever damage was proximately caused by this failure of the Tidelands 5 to take reasonable steps in the face of these known conditions.

Reversed and remanded.

4. See also Griffin, supra, § 156 at 369–370. "Dragging Anchor." A vessel colliding with another from dragging her anchor is liable "if she could have avoided the collision by proper measures, such as dropping a second anchor * * * or if she failed to take the precautions suggested by her position, by the weather * * *. Where such precautions have been neglected, it requires convincing proof to establish that they would have done no good, even though the weather may have been extraordinary * * *. Even a hurricane is no defense, if proper measures have not been taken for secure anchorage * *." And see Griffin, supra, § 241 at 544–545, cases in which defense [of inevitable accident] allowed or not allowed. "(1) high winds. When collision is due to the force of the winds in parting the lines of moored or anchored vessels or in causing them to drag, the defence is allowed only if it appears (a) that the force of the wind was not to have been anticipated; (b) that the vessel had been moored or anchored in such a way as to be prepared to withstand any winds reasonably to have been expected; (c) that there was no negligence on the part of those in charge of her. * * * The defence has been disallowed when any of the elements of proof referred to above have been absent. A collision is not inevitable * * * if the accident was contributed to by * * * failing to profit by storm warnings (the Drumcraig [D.C.] 133 Fed. 804 [1904]; Mackenzie v. Lighter No. 442, C.C.A.2, 30 F.2d 250, 1929 A.M.C. 135; Mulqueen v. Tug No. 16, C.C.A. 2, 50 F.2d 393, 1931 A.M.C. 1180). The burden of proof as to such matters is on the party asserting the defence * * *." Griffin, supra § 239 at 540–541. Precautions must be seasonable. "Here, as in collision cases generally, it is not enough that in the last minutes collision is inevitable. A vessel may not set up that the situation made the accident unavoidable, if she 'is not also excusable for getting into' that situation (Carroll v. City of New York, C.C.A. 2, 249 Fed. 453 [1918])." And see Swenson v. The Argonaut, 3 Cir., 1953, 204 F.2d 636, 1953 A.M.C. 1585; Clyde S.S. Co. v. United States, 2 Cir., 1928, 27 F.2d 727, 1928 A.M.C. 1341.