Joanne NAGLIERI, Individually and as
Executrix of the Estate of Thomas
Naglieri, Deceased, Plaintiff

v.

Gerald B. BAY and S/Y Crescendo,
in rem, her engines, tackle and
apparel, etc., Defendants

No. Civ.A. 3:94CV1295CFD.

United States District Court,
D. Connecticut.

Sept. 22, 1999.

Stephen K. Carr, Haight, Garduer, Holland & Knight, New York City, Bradford D. Conover, Lars Forsberg, John H. Reilly, Dickerson & Reilly, New York City, for plaintiff.

John MacCrate, III, James B. McQuillan, Bigham, Englar, Jones & Houston, New York City, Richard N. Petrucci, Stamford, CT, for defendant.

John V. Coulter, New York City, for the Defendants Gerald B. Bay and S/Y Crescendo.

## MEMORANDUM OF DECISION

DRONEY, District Judge.

This action arises out of a sailing accident that occurred on April 17, 1994, on Long Island Sound and resulted in the death of Thomas Naglieri. Plaintiff Joanne Naglieri, widow of Mr. Naglieri, brings her complaint individually and as executrix of Mr. Naglieri's estate against Gerald Bay and his sailing yacht, "Crescendo". The plaintiff seeks relief under general maritime law and Connecticut state law and has asserted claims for Mr. Naglieri's pain, suffering, death, and funeral expenses and for her own loss of

support, consortium, and services resulting from Mr. Naglieri's death.

The plaintiff alleges·that Mr. Bay, as owner and captain of the Crescendo, was negligent in causing the death of Mr. Naglieri, a crew member on the Crescendo. Mr. Bay denies the allegations of negligence and raises a number of special defenses, including that Mr. Naglieri executed an enforceable release prior to the accident. After consideration of all the evidence and testimony presented by the parties during a bench trial, the court concludes that the plaintiff has not demonstrated by a preponderance of the evidence that Mr. Bay was negligent.

The following are the findings of fact and conclusions of law determined by the court:

## I. FINDINGS OF FACT

The Crescendo is a forty-one foot cruising and racing sloop which is powered at various times by three types of sails: a mainsail, a jib, and a spinnaker. It also has an auxiliary engine. The Crescendo was purchased in 1990 by Mr. Bay and, from that time until the date of the accident, participated in many sailboat races on Long Island Sound and such offshore New England locations as Newport and Block Island. Mr. Bay was the captain of the Crescendo for most of these races and also for practices. The Crescendo sailed almost every weekend day from spring through fall and frequently during the week as well.

On Sunday, April 17, 1994, Mr. Bay and the Crescendo's crew for that day met at approximately 9:30 to 10:00 a.m. at the Harbor's End Marina in Stamford, Connecticut, where the Crescendo was docked. The crew was to take the Crescendo out that day to practice for a race scheduled for the following weekend. Including Mr. Bay, the crew consisted of nine members. The other eight members of the crew were Matt Baldwin, William Clemens, Peter Stein, Kristine Frampton, Katherine Gottlieb, Patrick Friedmann, Susan Klamka, and Thomas Naglieri.[1] A practice also had been scheduled for the day before, Saturday, April 16, but was canceled at the dock by Mr. Bay because of bad weather. Some of the same crew members, including at least Mr. Baldwin and Mr. Naglieri, had taken the Crescendo out the preceding weekend to practice. Mr. Bay was not on board for that practice.

The Crescendo's crew assembled for April 17 was an experienced one. All had sailed in races and most had considerable racing experience for a number of years on similar racing vessels. Most of the crew had also sailed extensively on the Crescendo in prior seasons. Mr. Naglieri had been sailing since at least the early 1970s and had owned a number of sailboats. He also had been involved in many competitive races as an owner, captain, and crew member. Mr. Naglieri had sailed on the Crescendo as a crew member at least five times prior to the day of the accident.

At the crew meeting, Mr. Bay discussed the crew members' assignments for the day and the plan for practicing. He had also obtained the weather forecast for that day and relayed it to the crew. He told the crew that the forecast was for wind in the "twenties"—in nautical miles per hour ("knots")—with higher gusts, and that a small craft advisory was in effect. A small craft advisory indicates that winds should be expected in the 20–25 knot range with gusts up to 33 knots. The Crescendo was designed for sailing and racing in those conditions. The air temperature was approximately fifty degrees. Part of the day's plan included practicing a man-overboard drill. At the meeting, Mr. Bay also recommended that the crew members wear a personal flotation device ("PFD") and/or a harness that would tether them to

---

1. The crew members were all volunteers, although Mr. Baldwin was paid by Mr. Bay for helping to organize and recruit crew members and for making sure that the Crescendo was ready to sail.

the boat, which were available on the Crescendo.[2]

During the crew meeting, Mr. Bay gave each crew member a release to sign as a condition of sailing on the Crescendo for the 1994 racing season. The releases were identical in language and provided:

Sailing is a sport which involves risk of injury and death. I understand that I am participating in this sport by my own decision and understand that I am responsible for my own safety. In consideration of my acceptance of participation in the Crescendo sailing program, I for myself and my heirs, legal representatives, successors and assigns, hereby waive any and all claims which I and any of them may at any time have against Gerald B. Bay, the yacht clubs, officers, members of the Board of Trustees, chairmen and members of club committees, other club members, other crew members, and any of their employees and agents arising out of my participation in the Crescendo sailing program whether on or off the water.

Mr. Bay explained the releases to the crew, including Mr. Naglieri.

Mr. Naglieri was fifty-six years of age and well-educated. He had a bachelor's and master's degree in business administration and had much business experience. After discussing the release with another crew member, Mr. Naglieri knowingly and willingly executed the release and returned it to Mr. Bay. All of the crew members except Mr. Baldwin executed releases.

The Crescendo was equipped that morning with all the Coast Guard-required safety equipment, including PFDs for all crew members, safety flares, and flotation devices. The Crescendo also had a man-overboard module ("MOM") attached to the stern (rear) railing.[3] The PFDs available to the crew were both the standard orange, Coast Guard-approved PFDs and the more expensive, inflatable PFDs, which, although new on the market and not yet approved by the Coast Guard, were more comfortable, provided better flotation, and preferred by most people who sailed.[4] Two of the crew members followed Mr. Bay's advice to wear a PFD: Susan Klamka and Katherine Gottlieb. Mr. Bay gave Ms. Klamka his personal PFD, which was designed to automatically inflate when submerged in water. Mr. Naglieri chose not to wear a PFD. None of the crew elected to wear a harness.

The Crescendo departed from Harbor's End at approximately 10:30 a.m., proceeded past the harbor and breakwater, and raised its mainsail. Although a small craft advisory was in effect, it was customary for a vessel such as the Crescendo, with an experienced crew, to practice sailing maneuvers on Long Island Sound in the expected weather and wind conditions on April 17, 1994. The crew members were at their assigned positions, with Mr. Bay at the helm, steering and commanding the Crescendo. Mr. Naglieri was in the open cockpit trimming the mainsail, which was his assignment for the day. The Crescendo proceeded on a roughly westerly heading with its mainsail and jib raised, tacking into the wind. Also practicing in that area of Long Island Sound that day were two other sailing vessels, "War Stories" and "Tabasco".

After proceeding upwind for approximately one hour, Mr. Bay decided to turn downwind in an area approximately three miles off Greenwich Point and raise the

2. A PFD is commonly known as a life jacket.

3. A MOM consists of a self-inflating horseshoe-shaped flotation device, a small sea anchor, and a self-inflating six foot pole. The MOM is designed to provide flotation and a visual reference for someone in the water.

4. Since the date of the accident, the inflatable PFDs have been approved by the Coast Guard.

spinnaker.[5] The other two boats on the Sound near the Crescendo were following a similar pattern of sailing upwind and downwind. The Tabasco had just completed a downwind run with its spinnaker raised and had turned and started heading upwind. The War Stories was trailing the Crescendo, heading upwind. Mr. Bay discussed raising the spinnaker with crew members Clemens, Baldwin, and Naglieri. The decision was made to raise the 1 ½ ounce [6] spinnaker, which was the heaviest and most durable of the spinnakers on board the Crescendo, and the best-suited for practicing that day.

The Crescendo and her crew, under the direction of Mr. Bay, gradually turned and raised the spinnaker. Before giving the order to raise the spinnaker, Mr. Bay steered the Crescendo on a "beam reach" (perpendicular to the direction of the wind), which is a less aggressive angle in relation to the wind in order to make it easier for the crew to set the spinnaker. The raising of the spinnaker involved all of the crew members and was accomplished without incident. The jib had been lowered when the spinnaker was raised, and Mr. Baldwin and Ms. Klamka began to "flake" (fold) the jib on the bow (front) of the Crescendo.

Approximately one to three minutes after the spinnaker was raised, however, as Mr. Bay states, "all hell broke loose." A sudden and unanticipated "wall of wind" in excess of 42 knots—either a huge, sustained gust or a strong microburst or downburst which then broke horizontally across the water—hit the spinnaker and drove the bow of the Crescendo under water. The water rushed over the bow and foredeck up near the mast. The Crescendo then violently crashed onto its port (left) side, causing, in nautical terminology, a "broach" of the vessel. During the broach, the port side was underwater and the starboard (right) side was above the Sound, parallel to the water. In addition, the boom (the "arm" for the mainsail) was submerged, allowing water to fill the mainsail. While the Crescendo was in broach, the wind continued at great velocity.

The wind and water in the mainsail and the wind in the spinnaker were causing the Crescendo to remain on its side. The spinnaker sheet and guy and the main halyard [7] were then released by a crew member in order to allow the Crescendo to finally right itself in the water. The Crescendo had been on its side for approximately one to one and one half minutes and had taken on about a foot of water.

The broach of the Crescendo caused several of the crew members to be cast into the cold waters of Long Island Sound and to be put in considerable danger.[8] Ms. Klamka was totally submerged on the port side but, after struggling on the surface and underwater, her PFD automatically inflated and she was assisted on board once the Crescendo had righted itself. Ms. Frampton, Mr. Baldwin, and Mr. Stein also were thrown into the water. All managed to scramble back on board the Crescendo, although Mr. Baldwin severely lacerated his knee in the process. Mr. Naglieri, who was not wearing a PFD, had been thrown overboard from his position on the starboard side of the Crescendo's cockpit and in the water off the stern, completely separated from the Crescendo.

Throughout the broach, Mr. Bay held on to the steering wheel of the Crescendo with one hand while much of his body was underwater. He was dragged along while

---

5. The spinnaker is the sail with the largest sail area and creates the highest forward speed for this type of sailing vessel.

6. This description refers to the weight of the cloth. There were two other lighter weight spinnakers on board that day.

7. "Sheet" and "guy" are nautical terms for ropes used to attach a sail to the deck of a boat and regulate the angle of a sail to the wind. A halyard is the rope used to hoist, lower, and attach a sail to the mast.

8. The water temperature was approximately forty degrees.

the Crescendo was pinned on its port side. His only connection to the Crescendo was his grip on the wheel. As the Crescendo lay on its side, Mr. Bay saw Mr. Naglieri in the water about twenty feet away and managed to pull himself up and release the MOM into the water to assist Mr. Naglieri. The MOM was located on the stern rail near the steering wheel. At that time, Mr. Bay also yelled "man overboard."

When the Crescendo finally came out of the broach and righted itself, Mr. Naglieri was a considerable distance upwind from the Crescendo. The MOM was floating in the water between the Crescendo and Mr. Naglieri. A number of the crew members were in distress and in need of or receiving attention, including Ms. Klamka, who was still in the water and then, after being pulled from the water, began suffering from hypothermia, and Ms. Frampton, who was having an asthma attack. Mr. Bay told Mr. Stein to act as the "spotter" for Mr. Naglieri to constantly keep him in sight. The Crescendo continued to drift farther away, downwind from Mr. Naglieri, as the crew and Mr. Bay tried to regain control of the Crescendo.

Because the Crescendo's mainsail was down and the crew was still recovering from the broach, Mr. Bay decided that the fastest way to head upwind to get to Mr. Naglieri was to start the engine and motor to him. Mr. Bay started the engine and yelled for the crew to "clear all lines" to avoid having the propeller become entangled in the many lines that were now loose. Mr. Bay saw some crew members gather the lines, heard a couple of crew members say "all lines in" and he looked to see whether it appeared that all were brought on board. He then engaged the engine into gear. The propeller, however, became fouled by the mainsheet, one of the lines used to adjust the mainsail and the line that had been controlled by Mr. Naglieri. The Crescendo was unable to return to Mr. Naglieri under engine power despite the crew's attempts to untangle the propeller.

After the Crescendo righted itself in the water and the crew, with the exception of Mr. Naglieri, had all gotten back on board, Mr. Baldwin retrieved the hand-held radio for Mr. Bay so he could contact the Coast Guard. Mr. Bay turned it on and overheard that the War Stories was in contact with the Coast Guard and had already asked for assistance. Mr. Baldwin also fired a flare to indicate Mr. Naglieri's location in the water to the War Stories, which was heading toward the Crescendo.

The crew of the War Stories had seen the broach of the Crescendo. At the time of the broach the War Stories was heading upwind, directly toward the Crescendo, and was approximately one half–mile away. After witnessing Crescendo's broach, the crew of the War Stories lowered its mainsail in anticipation of the strong wind headed its way. The War Stories continued upwind with only the jib raised. Upon seeing the flare fired by Mr. Baldwin, however, the War Stories engaged its engine and proceeded under engine power upwind toward the Crescendo to assist. The War Stories was the first to reach Mr. Naglieri and pull him from the water. Mr. Naglieri had been in the water for approximately ten minutes. CPR was administered to Mr. Naglieri on board the War Stories and he was taken to Greenwich Hospital by the Coast Guard. Mr. Naglieri was pronounced dead at 1:02 p.m. and his autopsy concluded that he had died of asphyxia due to submersion in water.

## II. CONCLUSIONS OF LAW

The elements of a negligence action under the general maritime law are the same as a common law negligence action. See In re Kinsman Transit Co., 338 F.2d 708, 721 (2d Cir.1964)(the principles of Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928), apply in admiralty); Weller v. Hudnut, No. 92–CV–70450, 1995 WL 871151, at *4 (E.D.Mich. May 15, 1995). In order to prevail on a claim for negligence under the general maritime law, the burden is on the plaintiff

to establish duty, breach of duty, causation (both cause in fact and proximate cause) and damages. *See, e.g., In re Cooper/T. Smith,* 929 F.2d 1073, 1077 (5th Cir.1991); *Weller,* 1995 WL 871151, at *4.

■ Under general maritime law, it is a settled principle that "the owner of a ship in navigable waters owes to all who are on board ... the duty of exercising reasonable care under the circumstances of each case." *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *accord Monteleone v. Bahama Cruise Line, Inc.,* 838 F.2d 63, 64–65 (2d Cir.1988) ("[I]t is now clear in this Circuit that the appropriate standard is one of reasonable care under the circumstances."). "In some instances reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less." *Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169, 170 (2d Cir.1983). "The extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger, will determine how high a degree of care is reasonable in each case." *Monteleone,* 838 F.2d at 65 (quoting *Rainey,* 709 F.2d at 172).

■ In this case, the circumstances surrounding the activities aboard the Crescendo were different, and potentially more dangerous, than those normally encountered in daily life. The conduct of Mr. Bay as owner and skipper of the Crescendo on April 17, 1994, must be weighed against the standard of a reasonably prudent skipper under similar circumstances. *See Weller,* 1995 WL 871151, at *5. In that vein, "[i]t is a well established principle of admiralty law that a vessel skipper or captain is ultimately responsible for the safety and welfare of his crew. The skip-

per has a duty to do whatever is reasonably necessary, not only to ensure the safety of his vessel and crew, but also to avoid, or at least minimize, the risk of harm to others." *Id.; see Boudoin v. J. Ray McDermott & Co.,* 281 F.2d 81, 84–85 (5th Cir.1960).

■ After carefully considering the evidence and weighing the credibility of the witnesses, the court finds that Mr. Bay did not breach his duty of care as owner and skipper of the Crescendo. Mr. Naglieri's death was an unfortunate and tragic accident, and not the result of negligence by Mr. Bay. Mr. Bay's conduct before, during, and after the broach of the Crescendo did not amount to a breach of his duty to Mr. Naglieri and was well within the standard of care.[9]

Prior to the broach, Mr. Bay acted reasonably to ensure the safety of his vessel and crew. The crew members assembled that morning were all experienced sailors and capable of taking the Crescendo out in the conditions that existed and were forecasted for April 17, 1994. The crew was informed of the plan for the day as well as the weather forecast and that a small craft advisory had been issued. Mr. Bay also recommended · and provided PFDs and harnesses for all of the crew members and had equipped the Crescendo with appropriate safety equipment. Mr. Bay was also under no duty to wear a PFD or harness or to require that any of the crew members, including Mr. Naglieri, wear a PFD or harness.

Mr. Bay's decision to take the Crescendo out to practice sailing maneuvers under the wind, weather, and water conditions expected and encountered that day was not an unreasonable risk to the Crescendo or its crew. It also was not negligent to take the Crescendo out for its practice

---

9. The conclusion that Mr. Bay was not negligent precludes the necessity of addressing whether the release signed by Mr. Naglieri would have been sufficient to absolve Mr. Bay of any liability. The conclusion of no negligence by Mr. Bay also eliminates the need to examine whether Mr. Naglieri was compara-

tively negligent, what damages are available to the plaintiff, and whether Joanne Naglieri is entitled to damages for loss of consortium and related losses. Finally, the issue of whether the Crescendo was properly served (which has been raised by the defendant) need not be addressed.

even though a small craft advisory had been issued, nor was it negligent to conduct the practice before conducting the man overboard drill that was planned for the day. Moreover, his decision to turn downwind and set the spinnaker was reasonable given the forecasted and encountered conditions. The Tabasco, another sailboat similar to Crescendo, had just completed a downwind run with its spinnaker raised, without incident. Since the Crescendo was out to practice for a race scheduled the following weekend, setting and sailing with the spinnaker was also prudent for the crew to prepare safely for the upcoming race. In preparing to set the spinnaker, Mr. Bay even took a less aggressive angle in relation to the wind to make it easier for the crew to set the spinnaker.

The broach of the Crescendo was not caused by the negligence of Mr. Bay or any of the crew and the velocity of the wind could not have been reasonably anticipated by Mr. Bay. The Crescendo was hit with an unforeseeable and unavoidable "wall of wind" or downburst that was well in excess of the wind conditions the Crescendo had been experiencing for the previous hour and well in excess of the conditions forecasted or reasonably expected for the day.

Mr. Bay's actions during and after the broach were reasonable. At the time Mr. Bay first observed Mr. Naglieri in the water, Mr. Bay was hanging onto the steering wheel of the Crescendo, half-submerged in water. The Crescendo was on its port side at that time and, in addition to Mr. Naglieri, four other members of the crew were in the water. The only action Mr. Bay or any prudent captain in Mr. Bay's position could take under those conditions was release the MOM and yell "man overboard," which he did.

Mr. Bay's decision to start the engine and motor to Mr. Naglieri after the Crescendo came out of the broach, rather than attempt to sail to him, was also reasonable. Given the distance which had opened up between the Crescendo and Mr. Naglieri during the broach, and given the condition of the crew after the broach (many of whom were in distress or being tended to by other crew members and would not have been able to effectively assist in raising and trimming the sails), the decision to proceed by motor instead of trying to sail upwind to Mr. Naglieri or to utilize a "quick-stop" maneuver [10] was reasonable. Mr. Naglieri was also too far away for Mr. Bay or any of the crew members to throw a flotation device and reach him.

Following the decision to motor to Mr. Naglieri, the fouling of the propeller with the mainsheet was not the result of negligence by Mr. Bay. Mr. Bay gave the order to clear all lines. Given the urgency of the moment and the reports from more than one of the crew members that all lines were clear, it was reasonable for Mr. Bay to engage the engine at that time. While, in hindsight, it may have been better to absolutely verify that all lines were on board, such a decision does not constitute negligence under the circumstances Mr. Bay faced at the time, the condition of the crew, and the need to get to Mr. Naglieri as quickly as possible. In addition, the crew of the Crescendo acted prudently by firing a flare and directing the War Stories toward Mr. Naglieri.

Accordingly, the court concludes that Mr. Bay did not breach his duty of care as owner and captain of the Crescendo and that Mr. Naglieri's death was not the result of negligence by Mr. Bay.

## III. JUDGMENT

In accordance with this memorandum of decision, it is ordered that JUDGMENT shall enter in favor of the defendants.

---

**10.** A quick-stop is a sailing maneuver designed to recover a person who has gone overboard using the power of the wind on sail to turn the boat around and return to the person in the water.