**MASSMAN–DRAKE**

v.

**TOWBOAT M/V HUGH C. BLASKE, BARGE CHEM 2, and their owner, American Commercial Lines, Inc.**

**Civ. A. No. 66–39.**

United States District Court
E. D. Louisiana, Baton Rouge Division.

Sept. 18, 1968.

Tom F. Phillips, Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for plaintiffs.

J. Y. Gilmore, Jr., Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for defendant, American Commercial Lines, Inc.

Wallace A. Hunter, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for third-party defendant, Two Twenty-Eight Terminal Services, Inc.

WEST, Chief Judge:

This is another of the many suits growing out of Hurricane Betsy which struck Baton Rouge, Louisiana, with all her fury on the night of September 9, 1965. This claim involves damages to a cofferdam belonging to the plaintiff, Massman-Drake, and being used in connection with the construction of a bridge over the Mississippi River at Baton Rouge, allegedly caused when the towboat M/V HUGH C. BLASKE and her tow collided with the cofferdam during the height of the storm. It is alleged that the cofferdam was damaged in the sum of $14,472.05, of which amount plaintiff, Massman-Drake, recovered $11,472.05 from its insurer, Connecticut Fire Insurance Company, who joins Massman-Drake as a plaintiff herein. Plaintiffs bring this suit against the BLASKE, the barge CHEM 2, and their owner, American Commercial Lines, Inc. As grounds for recovery, plaintiffs allege that the cofferdam, a fixed object, was struck and damaged by the BLASKE and the CHEM 2, one of the barges in her tow, as they floated down the river, and that the collision was caused entirely by the fault of the tug BLASKE and her crew. No process having issued against the BLASKE or the barge CHEM 2, the Court is, of course, without jurisdiction in rem of these vessels and the case therefore proceeded against their owner and

operator, American Commercial Lines, Inc., who defended on the ground of laches, unavoidable accident, act of God, and lack of negligence on the part of the BLASKE or her crew. Defendant American Commercial Lines also filed a third party complaint against Two Twenty-Eight Terminal Services, Inc., alleging that the BLASKE and her tow were set adrift after being struck by certain barges that had broken loose from the Two Twenty-Eight fleeting area and that thus the defendant American Commercial Lines should be indemnified by Two Twenty-Eight for any sums for which it, American Commercial Lines, should be held liable. Two Twenty-Eight Terminal, in answer to the third party complaint, denies the allegations of the complaint, denies negligence, and pleads unavoidable accident, laches, act of God, contributory negligence, and assumption of risk. Prior to trial, Two Twenty-Eight Terminal Services, Inc. moved for an involuntary dismissal which was granted without opposition.

The case was tried to the Court, without the intervention of a jury, and the Court now concludes that there is no merit whatsoever to plaintiffs' contentions that this accident was in any way caused by any negligence on the part of the BLASKE or her crew.

On September 9, 1965, at approximately 1:00 p. m., the motor vessel HUGH C. BLASKE, a twin screw river tow boat 170 feet long and 40 feet wide, under the command of Captain William O. Watson, arrived in the port of Baton Rouge with a tow of twenty-two barges. The BLASKE, which was owned and operated by defendant American Commercial Lines, Inc., was enroute from upriver ports with barges destined for Baton Rouge and New Orleans. Captain Watson is a veteran river boat pilot of more than twenty-five years, and holds Coast Guard licenses as Master of Steam and Motor Vessels of any gross tonnage on the Mississippi River and its tributaries. Navigational plans called for the BLASKE to stop at Baton Rouge temporarily in order to drop off certain barges

which were destined for that city and points west. Earlier that morning, Captain Watson had conversed with personnel in the American Barge Lines office at New Orleans and had received instructions regarding barge movements and pickups in the Baton Rouge area. At approximately 10:30 that morning, he contacted Two Twenty-Eight Terminal Services, Inc. and was informed, in Captain Watson's words, that "the weather picture was looking a little bad." As a matter of fact, the U. S. Weather Bureau advisory which was issued at 10:00 a. m. Baton Rouge time indicated that hurricane warnings were in effect from the mouth of the Mississippi River westward to Galveston, Texas, and gale warnings were displayed elsewhere from Mobile Bay to Matagorda Bay. Hurricane Betsy was described as fast-moving, large and dangerous. At this point the advisory stated: "It is too early to indicate a specific landfall of the center however the western Louisiana coast appears to be the most likely area for the center to move inland." No mention whatsoever was made of either Baton Rouge or New Orleans as being target areas or even as *possible* landfall areas for this storm. It was not until 6:00 p. m. Baton Rouge time that there was any definite indication that Betsy would bear down on New Orleans and vicinity. This information came in a bulletin from the Weather Bureau which stated that the storm was located some 170 miles southeast of New Orleans and was moving in a northwesterly direction at about 18 miles per hour. The center was expected to cross the Mississippi coast shortly after midnight.

Relying upon the 10:00 a. m. information, Captain Watson proceeded into Baton Rouge, arriving at approximately 1:00 p. m. With the aid of the Two Twenty-Eight fleet boat SKIPJACK, six barges were removed from the tow and secured to a nest above an oil dock on the east bank of the river. The BLASKE then secured her remaining sixteen barges to a Two Twenty-Eight shore cable located below the oil dock,

and went down to a lower Two Twenty-Eight fleet to check on and resecure other barges which belonged to American Commercial Lines, Inc. Then, at about 4:30 p. m., Captain Watson again contacted his New Orleans office via telephone. Due to the worsening conditions, he decided to remain in the Baton Rouge harbor rather than attempt to make the trip south. Accordingly, the BLASKE returned to her sixteen barges and began the task of securing herself to them. The barges were tied off in four rows of four each, and were then tied to a permanent 1⅛ inch shore cable owned by Two Twenty-Eight Terminal Services, Inc. Additional lines and wires were utilized, i. e., two one inch wires and two two inch poly deck lines, all of which ran from the barges to trees on the bank. The BLASKE and her sixteen barges were thus secured by about 6:30 p. m. The BLASKE was faced up to her tow, her stern upstream, and made up with winch wires from four leads and doubled ratchet wires on either side of the bow. At the center line were two two inch poly deck lines, as well as jockey wires ratcheted fast at that point. Captain Watson considered these precautions more than adequate security for the coming bad weather.

Hurricane Betsy, soon to become one of the most destructive storms ever to strike the Louisiana area, crossed the mainland just west and south of the city of New Orleans, and proceeded in a north, north-westerly direction. Early on the morning of September 10, 1965, the eye passed just west of Baton Rouge. By about 12:00 or 12:30 a. m. that morning, the winds in the harbor, which had been steadily increasing, reached a velocity of 80 to 90 miles per hour. The BLASKE remained secure at her berth, her tow undisturbed by the turbulence. Unfortunately, this state of affairs, was not to continue. Two barges, drifting down the river from above the existing bridge, were observed by Captain Watson on his radar unit. These barges collided with one of Two Twenty-Eight's upper fleets and broke some of those

loose from their moorings. Captain Watson of the BLASKE testified that he personally saw 50 or 60 barges that had broken loose floating free on the river. Other evidence shows that there were probably some 200 or more barges which broke loose and were floating free in the river. Some of these loose barges drifted down on the barges in the fleet where the BLASKE was moored, striking the BLASKE and her tow several times. As a result of these substantial blows, several of the ratchet and winch wires which connected the BLASKE to her tow parted. However, the centerline wires and lines did not part, and the BLASKE remained made up to her tow at that point. But the violent rocking back and forth caused the permanent shore line to up-root its securing tree. When this happened, one of the BLASKE's one inch wires pulled up its securing tree and the other parted. Then both of the two inch poly deck lines which had been tied to trees parted under the overwhelming stress. Thus the BLASKE, still made up to her tow, was cast loose from her shore mooring lines.

For a short time, she was able to hold her position near the east bank by holding her stern into the wind, which was blowing from the north, and putting her engines in reverse. Soon, however, the wind shifted somewhat and began blowing from the east and then from the south, as the eye approached the Baton Rouge area. This caused the BLASKE to be forced, gradually, into the center of the river. She found a resting place first against the anchor chains of the SS MARIA, which was riding at anchor in the river, but after a short while slid off and was blown upriver until she came in contact with those of the SS CYPRESS, also riding at anchor, at approximately 2:30 a. m. As the wind shifted, the head of the BLASKE's tow gradually swung around until the barge CHEM 2, at the starboard bow of the tow, came to rest against the southwest portion of plaintiffs' cofferdam, where it remained for some two hours or more. At one point, the personnel of the CYPRESS

requested that the BLASKE slide down about fifteen feet in order to prevent the CYPRESS from dragging her anchor. The BLASKE remained in this approximate position until 4:30 or 5:00 a. m., constantly backing her engines and holding as steady into the wind as she could. Finally, as the severe weather conditions began to abate somewhat, the crew was able to get additional lines and wires on the tow, back the BLASKE down around the east side of the cofferdam and maneuvered back to shore.

■■ Of course it is well settled that the collision of a moving vessel or barge with a stationary pier raises a presumption of negligence against the moving vessel, Patapsco Scrap Corp. v. Maryland Shipbuild. & Dry. Co., 268 F.2d 817 (CA 4–1959). As a general rule the moving vessel is liable for the resulting damages unless she can show affirmatively that her drifting was the result of an inevitable accident or a *vis major,* which human skill and precaution and a proper display of nautical skill could not have prevented. Trawler Jeanne D'Arc, Inc. v. Casco Trawlers, Inc., 260 F.Supp. 124 (DC Me.–1966), and the burden of proving inevitable accident or Act of God rests heavily upon the vessel or owner asserting such a defense. Boudoin v. J. Ray McDermott & Company, 281 F.2d 81 (CA 5–1960). Under circumstances such as these, the issue of freedom from fault is determined by the reasonableness of the precautions taken under the circumstances as known or reasonably to be anticipated. United States v. BARGE CBC 603, 233 F.Supp. 85 (E.D.La.–1964).

Plaintiffs contend that the master of the BLASKE was at fault, and they base this assertion on the fact that he tied up in a congested harbor, instead of seeking a more sheltered spot either up or downriver, and that he "should have anticipated" that there would have been a breakout such as occurred at the height of the storm. But this assertion is not supported by the evidence. The record clearly indicates that, although the BLASKE was in a long reach of the river, she was securely moored with extra lines, and in all probability would have remained safely moored had she and her tow not been struck by the drifting barges. The shore lines and wires parted and pulled up their securing trees *after* the BLASKE was struck. Although the jurisprudence indicates that vessels "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required," (L. Hand, J., in the *Hylas,* 1925 A.M.C. 921, 925, as quoted by the Fifth Circuit in the *Boudoin* case, supra), this Court is aware of no case holding that, under circumstances such as these, the master should have anticipated that as many as two hundred barges would part their moorings and fill the harbor with danger to other vessels and property. Captain Watson admitted that, theoretically speaking, it is safer to wait out a storm in a short reach of the river, as opposed to a long, relatively straight reach of the river such as is found in Baton Rouge. However, the record amply indicates that no better mooring spot was available to him and his tow. Captain Watson stated that, considering the size of his tow, it would have been impossible for him to take the BLASKE through the Devil Swamp Canal or the Port Allen locks. He could not have found security to the north because the banks on the channel side of the river had been revetted and this would prevent any sort of safe mooring. To proceed in a southerly direction would, of course, have taken him nearer the storm zone. In the words of Captain Francis A. Walk, plaintiffs' own expert marine surveyor and river pilot, the BLASKE was " * * * in about as safe a location right in the harbor as he could get * * *."

Captain Walk suggested that the crew of the BLASKE might have put out additional lines with a downstream lead so as to lend greater safety to her mooring. This bit of hindsight could have made no difference here. First of all, Captain Walk himself admitted that the setup of lines and wires which was used actually did include "additional" lines. At the

time that the winds were blowing strongest, they were out of the north and northeast, and downstream lines would not have helped make the tow more secure. Furthermore, as Captain Walk stated, a point of diminishing utility is reached with the use of additional lines. It is very difficult to maintain equal tensions on several different lines, with the result that one or two will receive all the strain until they part. This usually sets up a chain reaction and all of the lines fail to hold. Most importantly, however, it must be remembered that the record clearly indicates that the storm alone was not the cause of the BLASKE's being set adrift—it was in large measure the force generated by the impact of the collisions of the drifting barges with the BLASKE and her tow. It was only after these collisions that the trees, to which the lines were secured, were uprooted, and the other wires snapped. Had it not been for these collisions, the BLASKE would, in all probability, have remained secure at her moorings for the duration of the storm. So, for this Court to indulge in idle speculation concerning the possible utility of additional lines, over and above the unusual number actually used, would be to blink at reality.

In supporting their charge of failure to exercise human skill and precaution and a proper display of nautical skill, plaintiffs rely principally on three cases: Boudoin v. J. Ray McDermott & Company, 281 F.2d 81 (CA 5–1960); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (CA 5–1697); and Moran Transportation Corp. v. New York Trap Rock Corp., 194 F. Supp. 599 (S.D.N.Y.–1961). Defendants rely on Boudoin, supra, and United Geophysical Company v. Vela, 231 F.2d 816 (CA 5–1956), as authority for the proposition that what the law requires of the master of a vessel is that he obtain weather data, critically evaluate it and take reasonable steps to insure the safety of his vessel and crew. Where the vessel is put in the very center of destructive natural forces, defendant claims, the law requires that there be something more than a mere mistake in judgment by the master where he is faced with a hard choice between competing courses of action, and makes his decision *in extremis*. *Vela*, supra, is cited in support of this latter contention.

The *Vela* case involved an action for damages to a shed and dock which were situated on an inland stream near the Gulf of Mexico. Three small vessels, engaged in geophysical exploration work for their charterer, United Geophysical Company, found themselves endangered by an approaching hurricane. Seeking shelter from the tempestuous waters of the Gulf of Mexico, the masters of the three vessels tied them up to plaintiff's dock. During the course of the storm, one of them, the KING BELL, parted its lines and was blown against the dock, well-nigh destroying it. Plaintiff produced experts who claimed that it was a mistake to seek shelter in port; that what the three captains should have done was to attempt to ride out the storm in open waters of the Gulf. The District Court apparently agreed with this line of reasoning, and rendered judgment for plaintiff. The Fifth Circuit Court of Appeals reversed, saying:

"If we thought that, through some sort of nautical rear view mirror, it was for us, not these Masters, to make this decision, the wisdom of seeking shelter was, by striking coincidence, amply demonstrated. United had another boat, Supreme Food No. Ten, which, because of draft, could not make the channel where the other three were made fast. When the blow was over, the Supreme Food No. Ten was high and dry on or near the main levee of the Mississippi River after having dragged her anchor an estimated one-fourth to as much as one and one-half to nearly six miles.

"But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. 'The master is the commander of the ship —lord of his little world. He is master

in every sense of the word. * * *'. The Balsa, 3 Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment. 'The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of a captain of a vessel must be confined in a mental strait-jacket. * * *' The Lusitania, D.C.S.D.N.Y., 251 F. 715, 728." 231 F.2d at page 819.

Reasonable care under those trying conditions was indeed imposed on the vessels, stated the Court, but if in the good faith judgment of the masters, this was the best spot for them to seek in order to be protected from the elements, they did not need to withdraw to other places merely because the docks were nearby or might be damaged as the storm lashed the vessels about.

The *Vela* case was commented upon by the Court in the later decision in *Boudoin,* supra. This latter case was also an action for damages to a dock. There a large ocean-going barge was left at a dock near the Gulf of Mexico in the path of approaching Hurricane Audrey. Despite repeated warnings from the U. S. Weather Bureau concerning expected five to eight foot tides and hurricane force winds, the defendant's master left the barge, laden with drilling equipment, at a dock situated between the low-lying town of Cameron, Louisiana and the Gulf of Mexico. Although the defendant's tug had ample means of communication with shore and the various stations issuing weather information, no move was ever made to get the barge to safer waters. When Audrey struck, the devastation was beyond comprehension. The Court stated:

"All acknowledge that once Audrey hit, there was nothing that could then be done. Liability, if it exists, must turn on whether the barge causing the damage ought ever to have been in that predicament. * * *" 281 F.2d at page 82.

The Court then detailed the various weather bureau advisories and other storm warnings, and concluded:

"The tug captain was therefore compelled to realize that if storm tides of any substantial height occurred, this dock was not a safe place to remain. The margin in feet was very restricted. The upper edge of the Phillips dock [at which the barge was left] was not over three feet above the level of the river which for all practical purposes was sea level. The draft of the barge was 2 to 3 feet. Consequently, a rise of 6 feet in the tide would lift the barge above the dock. Obviously, once the dock afforded no resistance to the barge, no conceivable set of line could possibly have held this large barge with its extensive areas of exposure against winds of 100 mph or, worse, storm tides driven by such winds coming from the open sea." 281 F.2d at page 85.

The only unknown factors, said the Court, were *where* the storm would strike and *when* it would do so: *Finding that these questions were well answered by available weather information,* the Court held that the master was derelict in his duty to take reasonable steps to protect the barge and property of others in the vicinity.

The Fifth Circuit Court of Appeals found the facts in *Boudoin* distinguishable from those of the *Vela* case, supra. In *Vela,* it was pointed out, the vessel master was put in the center of destructive forces of nature without any previous negligence on his part. He could not then be faulted for any mistake in judgment he may have made in his "decision *in extremis.*" In *Boudoin,* the master found his barge in the teeth of a hurricane due to his own failure to properly analyze and evaluate available

weather information which, if properly analyzed, told him specifically that he was in great danger due to the tides.

In the opinion of this Court, the matter at bar is more nearly similar to the *Vela* case. Here Captain Watson moored his vessel and tow to the Two Twenty-Eight Terminal facilities because those, in his judgment, were the best facilities available. While at the time he moored his vessel he was in receipt of information that a hurricane was moving in from the Gulf, there was no advisory indicating with any degree of certainty that it would strike, with all its fury, the Baton Rouge harbor. But nevertheless, Captain Watson did, in fact, take all of the extra precautions that were indicated even had he been advised, with certainty, that his vessel was to be placed in the center of the hurricane. He was a skilled mariner and he used his nautical skill and judgment as would be expected of the captain of a vessel such as the BLASKE. Had it not been for the loose barges colliding with the BLASKE and her tow, she would, in all probability, have been able to ride out the storm. This Court could not, in good conscience, hold Captain Watson negligent for failure to anticipate that some two hundred barges would part their moorings and become a menace to his vessel. The collision involved in this case, and the resulting damage to plaintiffs' cofferdam were the result, purely and simply, of an Act of God over which the Captain of the BLASKE had no control. He took all of the precautions commensurate with the information at hand or available, which could reasonably have been expected of an experienced navigator and captain under the same circumstances, and he was in no way negligent in the manner in which he sought to protect his vessel and her tow. Since a discussion of the *Moran Transportation* case, supra, would add nothing to a decision of the issues here presented, it is the judgment of this Court that plaintiffs' demands for damages be, and they are hereby rejected. Judgment will be entered accordingly.