Petition of the **UNITED STATES** of America, as owner of the S/S **WINGED ARROW**, for exoneration from or limitation of liability.

**DAMMERS & VAN DER HEIDE SHIPPING & TRADING (ANTILLES), INC.,** as owner of the M/V **SANTA MARIA,** Claimant,

v.

The **STEAMSHIP JOSEPH LYKES,** her engines, etc., in rem, and Lykes Bros. Steamship Co., Inc., in personam, et als., Defendants.

**CENTRAL GULF STEAMSHIP CORPORATION,** as owner of the S/S **GREEN PORT,** Claimant-Appellant,

v.

**LYKES BROS. STEAMSHIP COMPANY,** Inc., and the S/S **JOSEPH LYKES,** et al., Defendants-Appellees.

**MARINE TANKERS, INC.,** as owner of the MT **SAVFUEL,** Claimant,

v.

S/S **JOSEPH LYKES,** her engines, etc., in rem, and Lykes Bros. Steamship Co., Inc., in personam, Defendant.

No. 27973
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

April 20, 1970.

Robert B. Acomb, Jr., Frank C. Allen, Jr., New Orleans, La., for Central Gulf.

John B. Gooch, Jr., New Orleans, La., for National Marine Service.

Edmond C. Salassi, Patrick L. Burke, New Orleans, La., for Dammers & Van Der Heide.

Alfred M. Farrell, Jr., Benjamin W. Yancey, New Orleans, La., for Lykes Bros. Steamship Co.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Thomas J. Boyle, Trial Atty., Admiralty & Shipping Section, Robert V. Zener and Robert M. Heier, Attys., U. S. Dept. of Justice, Washington, D. C., for the United States.

George W. Healy, III, New Orleans, La., for Thomas Jordan, Inc.

Before THORNBERRY, CARSWELL and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

■ The events at issue here were the result of one of nature's turbulent miscarriages, Hurricane Betsy, a wretched wench who lent credence to Voltaire's remark that "nature has always had more force than education."[1] The sultry storm struck the port of New Orleans on the night of September 9 and the early morning of September 10, 1965. Betsy produced winds of unprecedented force and a tidal surge that ran upriver with a velocity of over 20 m. p. h. During the hurricane, the SS Joseph Lykes, a ship without power or regular crew because it was undergoing repairs, and the USS Winged Arrow and certain Army barges broke loose of their moorings and eventually collided with the SS Green Port, a ship owned by Central Gulf Steamship Corporation, appellant here.

■ Central Gulf brought suit against Lykes Brothers Steamship Company, owner of the Joseph Lykes, and the United States, owner of the Winged Arrow and the Army barges, in the United States District Court for the Eastern District of Louisiana. The cause was tried to the Court. Central Gulf alleged that Lykes and the United States were negligent in preparing for the hurricane and in mooring the vessels, and that the damage done to the Green Port by the collisions with those vessels was partly the result of that negligence. In making this contention, Central Gulf evoked the traditional maritime presumption that fault lies with a moving vessel which collides with a stationary object or moored vessel. Lykes and the United States defended on the theory that the collisions were caused solely by the unprecedented, unexpected force and fury of Hurricane Betsy, an Act of God. The trial judge, filing extensive findings of fact and conclusions of law, held for Lykes and the United States. Petition of United States, E.D.La., 1969, 300 F. Supp. 358.

■ Under Rule 52(a) of the Federal Rules of Civil Procedure, a trial judge's findings are not to be set aside unless clearly erroneous. It is settled that the clearly erroneous standard of review applies in admiralty cases. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Compania Anonima Venezolana de Navegacion v. Perez Export Company, 5th Cir. 1962, 303 F.2d 692, 694. This Court does not sit in de novo review of the facts presented to the trial court, and we must give due deference to the opportunity of the trial judge to determine the credibility of the witnesses. A reading of the record convinces us that the findings of fact of the district court were reasonable and thus we accept those findings.

## I.

After lashing southern Florida with peak wind gusts of 105 m. p. h. in the Miami area and 140 m. p. h. in the Upper Keys, Hurricane Betsy entered the Gulf of Mexico rushing toward an uncertain destination. On the morning of September 8, she was moving generally in a west-northwesterly direction. On the afternoon of that same day, security preparations went forward in the port

---

1. Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. *See* Murphy v. Houma Well Service, 5th Cir. 1969, 409 F.2d 804, Part I; and Huth v. Southern Pacific Company, 5th Cir. 1969, 417 F.2d 526, Part I.

of New Orleans, the storm then being 450 miles away.

The Joseph Lykes, undergoing extensive repairs in the port of New Orleans, was without power and without a crew. Her deck machinery, cargo winches, and anchor windlass had all been removed ashore for sand blasting. Her anchors were unusable and she was moored starboard side to, bow upriver, at a wharf along the left descending bank of the river. Third Officer McCormick was aboard each working day beginning September 1; on September 8, her master, Captain Madison, rejoined the ship. On the afternoon of the 8th, at the direction of the owner's port captains, regular members of the Lykes shoregang reported to the Joseph Lykes to put out additional mooring lines. By 4 p. m., when the shoregang departed, the Joseph Lykes, had out five headlines, two forward breast lines, one forward spring line, four back spring lines, and four stern lines, some broken out of the gear locker and used for the first time.

By the afternoon of September 9, Betsy's rate of advance up the Gulf had increased to 12 m. p. h. The storm was intensifying and took a northwesterly tract. Lykes again sent members of the shoregang to the Joseph Lykes. They put out additional lines, ultimately filling each of the ship's bitts and bollards with the maximum load of 8-inch mooring lines. Counting bights and leads of the double lines, there were 30 leads to the steel cleats and bollards on the wharf. During the late afternoon, five members of the shoregang were ordered to assist Captain Madison and Mr. McCormick as security watch aboard ship. The weather worsened continually and by 9:30 p. m., peak gusts reached an estimated 100 m. p. h. Thereafter the wind was constant, and increasing in velocity. Captain Madison and a seaman patrolled the main deck and the wharf in checking the moorings. The lines were holding well and under an even strain.

When it became apparent that the Winged Arrow would have to ride out the hurricane, the Government's Maritime Administration ordered additional moorings for the vessel. By 3 p. m. of the afternoon of September 9, the ship's crew had completed the additional moorings. The Winged Arrow's mooring arrangement consisted of two one and one-quarter inch wire cables, one forward and one aft, and between fourteen and twenty manila and synthetic lines to each available bollard on the wharf. On the evening of September 9, the captain of the Winged Arrow periodically inspected his ship's lines and was satisfied that they had an even strain and were sufficient for the impending hurricane.

The moorings of the Army barges had also been strengthened by additional lines put out that morning. When the barge mooring arrangement had been completed, it consisted of at least six parts of six-inch manila line at each end of each barge running on each side to either the wharf or the next adjacent barge in the tier, each tier containing no more than four barges. This arrangement was periodically inspected by Navy officers on duty on the night of September 9 and found to be sufficient for the impending hurricane.

During the evening, the river rose rapidly. A rise of 3.6 feet was recorded between 9 and 10 p. m. in the harbor, the river reaching an elevation of 12.4 feet at midnight. This rise was accompanied by an extraordinary phenomenon of a tidal surge running *upriver* with an estimated velocity of over 20 m. p. h. By 10 p. m. and thereafter, the winds in the port blew from a northeasterly direction moving clockwise to east-northeast. It was a vengefully furious wind, with estimated velocity of between 120 m. p. h. and 150 m. p. h. The wind, moving clockwise, played on the starboard beams and quarters of the Joseph Lykes and Winged Arrow, placing maximum strain on those vessels' moorings. Conversely, in the best tradition of feminine favoritism, Betsy's east-northeast wind at Algiers Bend was from offshore and held the Green Port onto the docks.

Shortly after 10 p. m., when Seaman Sloot was patrolling the dock off the

forward section of the Joseph Lykes, two or more dock bollards, used in common by stern leads of the Joseph Lykes and bow leads of the Winged Arrow, tore loose from their cement foundations. This caused the stern of the Joseph Lykes and the bow of the Winged Arrow to fall free and out into the river. The even strain on the ships' lines was destroyed and the rest of the moorings quickly severed. The Joseph Lykes was blown offshore and taken upriver. The Winged Arrow dropped her starboard and port anchors, but within a matter of minutes the tidal surge and battering winds snapped the remaining moorings and the anchor chains, and the vessel chased the Joseph Lykes up the Mississippi River.

The Joseph Lykes, moving upriver at an estimated speed of 20 m. p. h., raked the Army barges. The barges were set adrift either by that raking or by a second raking by the Winged Arrow, which was moving upriver on the heels of the Joseph Lykes. Now, the Joseph Lykes, the Winged Arrow and the Army barges were all adrift and heading upriver. After a wild and destructive journey up the river, the Joseph Lykes heavily raked the whole port side of the Green Port. This temporarily halted the Joseph Lykes, and her port bow overlapped that of the Green Port. Approximately twenty minutes later, the Winged Arrow rammed the Joseph Lykes just forward of her bridge, and then swung about and struck the Green Port's hull. Before and during these occurrences, various Army barges nested and pounded against the hapless Green Port.

■ The trial court held that the collisions and resulting damage to the Green Port were the result of an Act of God and exonerated Lykes and the United States from liability. In seeking to overturn this decision, Central Gulf relies on the settled rule that where a collision occurs between a moving vessel and a moored vessel, a presumption of fault is raised against the offending vessel, which presumption must be rebutted by a preponderance of the evidence.

The moving vessel must show that her drifting was the result of an inevitable accident or a *vis major,* which human skill and precaution and a proper display of nautical skill could not have prevented. The burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense. *See* Boudin v. J. Ray McDermott & Company, 5th Cir. 1960, 281 F.2d 81, 88; The Lackawanna, 2d Cir. 1913, 210 F. 262; Massman-Drake v. Towboat M/V Hugh G. Blaske, E.D.La., 1968, 289 F.Supp. 700.

■ It is admitted by all parties that Betsy was an Act of God. Central Gulf, however, contends that Lykes and the Government were negligent in making preparations for the storm and that their negligence contributed to the damage sustained by the Green Port. The test for determining whether Lykes and the United States were free from fault is whether they took reasonable precautions under the circumstances as known or reasonably to be anticipated. If those responsible for the Joseph Lykes, the Winged Arrow and the Army barges were reasonable in their anticipation of the severity of the impending storm and undertook reasonable preparations in light of such anticipation, then they are relieved of liability. The standard of reasonableness is that of prudent men familiar with the ways and vagaries of the sea.

■ The trial court, after considering the testimony of several witnesses and considering extensive documentary evidence, concluded that Lykes and the Government had indeed taken reasonable precautions in light of the circumstances. We are not prepared to hold that the trial court erred in that conclusion. It is clear that both the severity of the winds and the extraordinary tidal surge were unprecedented; it is also clear that prudent men familiar with the sea would have expected a storm of perilous dimensions. The district court found that the Joseph Lykes, the Winged Arrow and the Army barges were moored in a

manner calculated to withstand such a storm. We accept that finding.

The evidence shows that the lines on the Joseph Lykes and the Winged Arrow were holding even and well until two or more dock bollards were literally pulled out of their concrete foundations due to the fearsome force of the onshore wind and upriver tidal surge. Even after the bollards broke, the Winged Arrow attempted to hold to by dropping her anchors, the chains of which were constructed of two and one-half inch stud links and had recently been inspected and approved by the Coast Guard. A naval architect testified that it would take a wind force of at least 168 m. p. h. to sever such anchor links. He further testified that he had never before heard of winds of such force occurring in the New Orleans area and had never before heard of any anchor chain breaking under pure strain.

The moorings of the Army barges, too, were apparently holding firm until the barges were raked by the Joseph Lykes and Winged Arrow.

It would serve no useful purpose to make a more detailed recitation of the evidence presented in the trial court. Suffice it to say that the evidence outlined above and the weight of evidence in the record as a whole convinces us that Lykes and the United States were not negligent in making preparations for the arrival of the storm and that the damage inflicted on the Green Port was caused solely by the extraordinary, unforeseeable, and catastrophic character of Hurricane Betsy, an Act of God. We therefore affirm the district court's judgment exonerating Lykes and the United States from liability.

## II.

Central Gulf also made a claim for salvage against Lykes and the United States. The district court found that no one of the Green Port's crew handled a single line between the Green Port and the Joseph Lykes during the time that their bows were lodged together, nor later, when the Joseph Lykes was knocked loose by the Winged Arrow and was made fast to the dock by her own lines, handled by her officers and crew. The district court also found that no member of the Green Port crew handled the lines to the Army barges, or performed any act whose purpose was the securing or salvaging of the barges.

These findings were based on the weight of the evidence and are not clearly erroneous. Most of the evidence bearing on the question of salvage was in the form of testimony by the witnesses. The trial court was in a position to judge the credibility of those witnesses, and deference must be given to his credibility determinations. It is significant that no individual of the Green Port's crew came forward to report an alleged act of salvage to the Joseph Lykes. The record is devoid of evidence showing that any acts of salvage were performed by the officers or crew of the Green Port. Therefore, we affirm the district court's judgment denying salvage to Central Gulf.

Affirmed.