Filed 3/12/20

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| EDDY MCHENRY, | B292457 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC641363) |
| v. | |
| ASYLUM ENTERTAINMENT DELAWARE, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Los Angeles Superior Court, Benny C. Osorio, Judge.  Affirmed.

Kiesel Law, Paul R. Kiesel, Steven D. Archer, and Melanie Palmer for Plaintiff and Appellant.

Arnold & Itkin and Cory Itkin (admitted pro hac vice) for Plaintiff and Appellant.

Esner, Chang & Boyer, Stuart B. Esner, and Steven T. Swanson for Plaintiff and Appellant.

Cox, Wootton, Lerner, Griffin & Hansen, Terence S. Cox, Mitchell S. Griffin, and Mark E. Tepper for Defendant and Respondent.

\* \* \* \* \* \*

A seaman on a commercial fishing vessel out on the Gulf of Mexico accidentally sliced up his hands with hooks and fish gills. The vessel's captain arranged to have a second vessel meet them at sea and ferry the seaman back to shore so he could get medical attention. The middle-of-the-night rendezvous on the high seas was a success but did not come soon enough to save all of the seaman's fingers; due to infection, many had to be amputated. These dramatic events were all caught on film because, as serendipity would have it, a production company was filming a reality TV show on the fishing vessel as these events unfolded. The seaman sued the vessel's owner and the production company, among other parties, for his injuries under federal maritime law.

The viability of the seaman's lawsuit against the production company requires us to address the following questions: (1) Is the production company liable under the Jones Act (46 U.S.C. § 30104) because it "borrowed" the crew members as "employees" by filming them doing their jobs and by occasionally asking them to repeat what they are doing for the camera and explain it, and (2) Is the production company liable under maritime tort law because (a) it had a "special relationship" with the crew members it was filming sufficient to give rise to a duty to rescue them, (b) it voluntarily assumed a duty to rescue but effectuated that rescue with gross negligence, worsened the crewman's position or caused the crewman to detrimentally rely on its rescue efforts, or (c) it acted negligently in "taking charge" of a "helpless" person within the meaning of Restatement First and Second of Torts, section 324? We conclude

2

that the answer to these questions is "no," and affirm the trial court's grant of summary judgment in favor of the production company.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The Big Fish Texas Production*

Asylum Entertainment Delaware, LLC (Asylum) is a production company that films reality TV shows. In early 2015, NGC Network US, LLC (National Geographic) hired Asylum to produce eight episodes of a reality TV show that would follow the trials and tribulations of life on a commercial fishing vessel in the Gulf of Mexico; the show was to be called *Big Fish Texas*.

To facilitate this show, National Geographic negotiated with Keith "Buddy" Guindon (Buddy)[1] to allow Asylum to film the crew of *The M/V Black Jack IV*, one of several commercial fishing vessels Buddy owned, on a two-week voyage starting in late March 2015. Buddy signed a *Location Release Form* authorizing the filming, and National Geographic agreed to pay him $5,000 per episode. On that voyage, the captain of *The M/V Black Jack IV* was Buddy's son, Hans Guindon (Hans). All of the vessel's crew members signed an *Appearance Release Form*, and received no additional compensation for doing so. That form gave Asylum permission to "tape and photograph [each member], and record [his or her voice]," and granted Asylum "exclusive owner[ship] of the results and proceeds of such taping."

---

[1] Because two members of the Guindon family are involved in this case, we use first names for clarity. We mean no disrespect.

3

Asylum arranged for two of its employees—a producer and a cameraman—to be passengers on *The M/V Black Jack IV* during the voyage.

### B.  *Plaintiff's hiring*

Days before *The M/V Black Jack IV* was to shove off, Buddy hired Eddy McHenry (plaintiff) to serve on its crew as an "independent contractor."  Plaintiff had experience owning and working on a shrimping boat on the Gulf, but had never served aboard a commercial fishing vessel like Buddy's.  Because this was plaintiff's first time as a crew member on this type of vessel, he was dubbed a "greenhorn."  Plaintiff signed a Release and Waiver of Liability with *The M/V Black Jack IV*.  Like the other crew members, plaintiff also signed an *Appearance Release Form* with Asylum.

### C.  *The voyage*

#### 1.  *The Asylum employees' role*

The "primary duty" of the Asylum employees on board *The M/V Black Jack IV* was to "observe[] and document[]" the crew's activities, especially those that "would appeal to the public interest."  They were to be the proverbial "flies on the wall."  On occasion, the producer or cameraman would ask crew members to repeat an activity a second time while it was being filmed, or to articulate or explain what they were doing.  At no point, however, did either Asylum employee tell any crew member "what to do" or have any authority to direct the fishing operations of *The M/V Black Jack IV*.

#### 2.  *Plaintiff's injury*

Two or three days after *The M/V Black Jack IV* left port from Galveston, Texas, plaintiff ended up cutting his hands on hooks or fish gills.  His hands became sore and swollen, and he

could no longer grip anything with them. At the suggestion of, and with the aid of, another crew member, plaintiff cut his hands with a razor blade in order to drain the excess fluid and puss from his wounds; he then submerged his hands in rubbing alcohol to disinfect them. The Asylum employees filmed the cutting. The cutting only made his hands worse; they became even more "swollen" and "pussy" and turned "kind of . . . green."

   3. *Reacting to the injury*

  Panicked by the worsening condition of his hands, plaintiff asked Asylum's producer and its cameraman for help. Although the producer reported that he promised only to "pass . . . on" this news to Hans, the captain, plaintiff reported that both the producer and cameraman further promised to "get [plaintiff] a helicopter [to] get [him] off the boat."

  Plaintiff did not sit idly by, however. He also directly told Hans about his worsening condition and asked to be evacuated.

  Hans considered "three courses of action" for getting plaintiff proper medical attention: (1) returning *The M/V Black Jack IV* to Galveston, (2) rendezvousing with Buddy, who could then take plaintiff back to Galveston on a faster ship, or (3) calling the Coast Guard to see if they would send a helicopter to evacuate plaintiff. In making his decision, Hans consulted with several people. Hans asked the on-board producer for his input, and the producer said it "wouldn't hurt to call the Coast Guard and alert them." Hans "talk[ed] through options" with Asylum's "production team" back on shore, and the lead producer felt that plaintiff's "health" was of "primary" concern. Hans also consulted with his father, Buddy. Hans ultimately decided to have Buddy rendezvous with *The M/V Black Jack IV* in Buddy's high-speed

boat, *The M/V Hullraiser*.  This decision was Hans's and Hans's alone.

        4.     *The rescue*

Buddy left Galveston in *The M/V Hullraiser* around sundown on the day the decision was made to evacuate plaintiff.

Asylum arranged for an emergency medical technician (EMT), a camera operator and an Asylum producer to be on that ship.  The EMT arrived at the dock about three hours before *The M/V Hullraiser* departed, and while he waited to depart, signed an *Appearance Release Form* and was fitted with a microphone.  *The M/V Hullraiser* departed the moment Buddy was ready; as Buddy later explained, "I didn't wait for anyone."

A few hours past midnight, *The M/V Hullraiser* rendezvoused with *The M/V Black Jack IV* on the dark waters of the Gulf.  Plaintiff was transferred to *The M/V Hullraiser*.  The EMT was able to assess plaintiff's condition, but was unable to treat it because he had no antibiotics.  The two Asylum employees aboard *The M/V Hullraiser* did not tell the EMT "how to do [his] job," but asked him general medical questions and implored him to check on plaintiff every 30 to 60 minutes, which was the EMT's practice anyway.  The EMT later stated that these questions both did and did not interfere with his treatment of plaintiff.

Upon reaching shore, plaintiff was immediately transported to the emergency room of a Galveston hospital.

        5.     *The outcome*

Plaintiff ended up losing three fingers to infection.

Plaintiff's injury, the deliberations over how to evacuate him, and the rescue itself were featured prominently in the final

episode of the *Big Fish Texas* season dedicated to *The M/V Black Jack IV*.

## II. Procedural Background

In June 2017, plaintiff sued (1) Buddy, Hans and several related companies owned by the Guindons,[2] and (2) Asylum.[3] He alleged that these defendants were responsible for his injuries under (1) the Jones Act (46 U.S.C. § 30104), (2) negligence and negligence per se under general maritime law, and (3) the failure to provide prompt medical care.[4]

Plaintiff settled with Buddy, Hans and their companies.

In March 2018, Asylum filed a motion for summary judgment and/or summary adjudication. After entertaining a full round of briefing and argument at a hearing, the trial court issued and ultimately adopted an 11-page tentative ruling granting summary judgment to Asylum. The court ruled that plaintiff's Jones Act claim failed as a matter of law because plaintiff was neither a "direct" employee nor a "borrowed servant" of Asylum's. The court further ruled that plaintiff's remaining tort claims failed as a matter of law because Asylum had no "special relationship" with plaintiff obligating it to rescue him and because Asylum did not undertake a rescue of plaintiff in a

---

[2]    Those companies are Black Jack IV, LLC, Katie's Seafood Market, LLC and Katie's Seafood, LLC.

[3]    Plaintiff also sued National Geographic, but it is not a party to this appeal.

[4]    Plaintiff also alleged claims for intentional and negligent infliction of emotional distress, but voluntarily dismissed those claims early on in the lawsuit.

7

manner that was grossly negligent or that otherwise put plaintiff in a worse position.

Following the entry of judgment, plaintiff filed this timely appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in granting summary judgment in Asylum's favor because triable issues of material fact remain as to several issues. We independently review an order granting summary judgment. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford Casualty*).)

## I.    Overview of Pertinent Law

### A.    *The law governing summary judgment motions*

Summary judgment is appropriately granted when "the moving party is entitled to judgment as a matter of law" because "'all . . . papers submitted show that there is no triable issue [of] . . . material fact.'" (*Hartford Casualty*, *supra*, 59 Cal.4th at p. 286, quoting Code Civ. Proc., § 437c, subd. (c).) A "triable issue of material fact" exists "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) In evaluating whether there is a triable issue of material fact, we must view the evidence in the light most favorable to the opposing party by "strictly constru[ing]" the evidence of the moving party, "liberally constru[ing]" that of the opposing party, and resolving any doubts against summary judgment. (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874.) Because "[s]peculation . . . is not evidence" (*Aguilar*, at p. 864), speculation cannot create a triable issue of

material fact.  (Accord, *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1453 ["A triable issue of fact can only be created by a conflict of evidence, not speculation or conjecture."].)

**B.    *Liability for torts under maritime law***

Although state courts have concurrent jurisdiction over lawsuits seeking recovery for torts committed on the high seas (28 U.S.C. § 1333; *Garrett v. Moore-McCormack Co.* (1942) 317 U.S. 239, 245 (*Garrett*)), the law applied in such lawsuits is federal substantive law, not state law.  (*Garrett*, at p. 245; *Intagliata v. Shipowners & Merchants Towboat Co.* (1945) 26 Cal.2d 365, 371-372; *Fahey v. Gledhill* (1983) 33 Cal.3d 884, 887.)

1.    *The Jones Act*

The Jones Act is a federal law that authorizes "seamen" to sue persons who employ them either as formal employees or independent contractors for their negligence.  (*Chandris, Inc. v. Latsis* (1995) 515 U.S. 347, 354, 361-362; *Norfolk Shipbuilding & Drydock Corp. v. Garris* (2001) 532 U.S. 811, 817 (*Norfolk*); *Mahramas v. American Export Isbrandtsen Lines, Inc.* (2d Cir. 1973) 475 F.2d 165, 171; 46 U.S.C. § 30104.)  "Seamen" are "mariner[s] . . . who live[] [their] life upon the sea" (*Warner v. Goltra* (1934) 293 U.S. 155, 157), and who are thus "continually exposed to the hazards of the deep" (*Reyes v. Vantage S.S. Co.* (5th Cir. 1977) 558 F.2d 238, 243).  The Jones Act changed the prior law that had limited employers' liability to the cost of "maintenance and cure" (*The Osceola* (1903) 189 U.S. 158, 175), and did so by granting seamen "the same rights to recover for negligence as other tort victims" (*McDermott Int'l., Inc. v. Wilander* (1991) 498 U.S. 337, 342).  Despite its remedial goal (*Spinks v. Chevron Oil Co.* (5th Cir. 1975) 507 F.2d 216, 224, overruled in part on other grounds, *Gautreaux v. Scurlock*

9

*Marine, Inc.* (5th Cir. 1997) 107 F.3d 331, 339), however, the Jones Act's expanded remedy applies only against a seaman's employer. (*Cosmopolitan Shipping Co. v. McAllister* (1949) 337 U.S. 783, 787, fn. 6 (*McAllister*) ["a seaman has the advantages of the [Jones] Act only against his employer"]; *Norfolk*, at p. 817.)

### 2. *Maritime tort law*

To recover for injuries due to another's negligence "under . . . general maritime law," a plaintiff must establish (1) the defendant's duty to act, (2) breach of that duty, (3) causation, and (4) damages. (*Naglieri v. Bay* (D. Conn. 1999) 93 F.Supp.2d 170, 174-175 (*Naglieri*); see also, *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573 [same, under California tort law].) In defining the duty element, maritime law looks both to state law and to the Restatement of Torts. (*In re Aramark Sports & Entm't Servs., LLC* (10th Cir. 2016) 831 F.3d 1264, 1279.) However, "duty" is "ultimately" "a question of public policy" and, as such, is a question of law we independently examine. (*Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 605; *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1080.)

## II. Analysis

### A. *Liability under the Jones Act*

It is undisputed that plaintiff is a "seaman." It is also undisputed that a seaman's employer owes him a "'a duty to do whatever is reasonably necessary . . . to ensure the safety of [the] vessel and [its] crew.' [Citation.]" (*Naglieri, supra*, 93 F.Supp.2d at p. 175; *Boudoin v. J. Ray McDermott & Co.* (5th Cir. 1960) 281 F.2d 81, 85 (*Boudoin*) [same].) That duty includes "the duty to rescue [and] to take proper and efficient means to effect a rescue . . ." (*Ferro v. United States Lines Co.* (S.D.N.Y. 1947) 74 F.Supp.

10

250, 253-254), which in turn encompasses a duty to obtain "necessary assistance" for a crew member's injuries that render the crew member "unfit" for "his or her routine duties" and that "require[] professional medical treatment." (46 U.S.C. § 2303, subd. (a); 46 C.F.R. § 4.05-1.) Thus, the viability of plaintiff's Jones Act claim turns solely on whether Asylum is his "employer."

Asylum is not plaintiff's formal employer because it is undisputed that plaintiff was hired by, and worked for, *The M/V Black Jack IV*. However, if one entity "lends an employee to [a] [second entity] to do a particular job," the employee becomes the "borrowed servant" of the second entity "actually directing his work." (*Maddux v. United States* (S.D. Ohio 2010) 2010 U.S. Dist. LEXIS 132466, *12; *Hall v. Diamond M Co.* (5th Cir. 1984) 732 F.2d 1246, 1249 (*Hall*); accord, Rest.2d Agency, § 227 ["A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services."].) This renders the second entity vicariously liable for the employee's torts (*Societa Per Azioni Navigazione Italia v. City of L.A.* (1982) 31 Cal.3d 446, 456 (*Societa*)), and, more to the point here, renders the second entity liable to the "injured worker" as his employer under the Jones Act (*Hall*, at p. 1249).

There is no "fixed test" defining when a worker loaned to a second employer becomes its "borrowed servant." (*Hall*, *supra*, 732 F.2d at p. 1249.) The "'most important'" factor is whether the second employer "has the power to control and direct the servant[] in the performance of [his or her] work." (*Linstead v. Chesapeake & O.R. Co.* (1928) 276 U.S. 28, 34 (*Linstead*); *Societa*, *supra*, 31 Cal.3d at p. 459.) For this purpose, "control" means "authoritative direction and control," not merely "the power to

11

suggest details or the necessary cooperation." (*Linstead*, at p. 34; *Societa*, at p. 460; *Hall*, at p. 1249.) What matters is the power to control, not whether that power has been exercised. (*Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 879.) And the focus is on which employer has the power to control the employee's *performance of specific acts*. (Accord, Rest.2d Agency, § 227 ["He may become the other's servant *as to some acts and not as to others*."], italics added.) Although the power to control is paramount, other factors also have some bearing on whether an employee of one entity is the borrowed servant of the other; these include: (1) which employer's "work [was] being performed," (2) whether "there [wa]s an agreement, understanding, or meeting of the minds between the original and borrowing employer," (3) whether "the employee acquiesce[d] in the new work situation," (4) whether "the original employer terminate[d] [its] relationship with the employee," (5) which employer "furnished [the] tools and place for performance," (6) whether "the new employment [was] over a considerable length of time," (7) which employer "ha[d] the right to discharge the employee," and (8) which employer "had the obligation to pay the employee." (*Hall*, at p. 1249; accord, *Glynn v. Roy Al Boat Management Corp.* (9th Cir. 1995) 57 F.3d 1495, 1499 (*Glynn*), abrogated on other grounds, *Atl. Sounding Co. v. Townsend* (2009) 557 U.S. 404.)

There is no triable issue of material fact as to whether plaintiff was a "borrowed servant" to Asylum's; as a matter of law, he was not. We reach this conclusion for two reasons.

First, the undisputed evidence establishes that Asylum did not have the right to control what happened aboard *The M/V Black Jack IV*. Neither the producer nor cameraman on board the vessel controlled how plaintiff or any other crew member did

12

his job; at most, they asked crew members to repeat or explain what they were doing for the camera. This does not even amount to "the power to suggest details or the necessary cooperation," let alone "authoritative direction and control." (*Linstead*, *supra*, 276 U.S. at p. 34; *Societa*, *supra*, 31 Cal.3d at p. 460; *Hall*, *supra*, 732 F.2d at p. 1249.) And no one from Asylum controlled *The M/V Black Jack IV* or its captain. Although Hans solicited the input of the Asylum employees on board as well as those on shore regarding how to respond to plaintiff's medical emergency, Hans opted not to follow that input when he decided to rendezvous with *The M/V Hullraiser* rather than call the Coast Guard. Because the right to control must mean something more than the right to make suggestions that can be ignored, the undisputed facts show that Asylum had no right to control how plaintiff or Hans did their jobs.

Plaintiff resists this conclusion with several arguments. He points to his deposition testimony where he initially proclaimed that the cameraman and producer aboard *The M/V Black Jack IV* were "running the show" and "telling people what to do" on the ship. But plaintiff went on to clarify that what he meant was that they were asking them to re-do and explain tasks for the camera. Plaintiff cannot ignore his clarified and narrowed explanation in favor of his initially overbroad generalization. Plaintiff suggests that because Asylum subsequently featured his medical emergency as a prominent "plot point" in its *Big Fish Texas* show, Asylum must have controlled the hiring process and directed Buddy to hire a "greenhorn" who was more likely to get injured. This is pure speculation and is also contradicted by the undisputed evidence that *Buddy alone* made the decision to hire plaintiff. Plaintiff cites deposition testimony from Asylum's on-

13

board producer that crew members aboard *The M/V Black Jack IV* occupied a "dual role as both fisherman on the one hand and TV show characters on the other." This does not aid plaintiff because the "borrowed servant" doctrine is, as noted above, task specific (accord, Rest.2d Agency, § 227), such that plaintiff would at most be Asylum's "borrowed servant" for purposes of being a "TV show character." But in that capacity, Asylum would still not be his employer for purposes of his "role as [a] fisherman," for which the vessel's captain retained the right to control how plaintiff did his job as a crew member and how to get him medical treatment. Lastly, plaintiff complains that the trial court was wrong to focus on Asylum's control as the primary factor to the exclusion of the other, secondary factors. This complaint ignores that control *is* the "most important" factor (*Societa, supra,* 31 Cal.3d, at p. 459), and that the remaining factors also point away from plaintiff being Asylum's borrowed servant because *The M/V Black Jack IV*—not Asylum—dictated what work plaintiff did, provided him tools and his workplace, had the right to fire him, had the duty to pay him, and never terminated its relationship with him.

Second, we decline to construe the borrowed servant doctrine in the maritime context to impose a duty upon passengers and observers on a vessel, like Asylum, to undertake acts inconsistent with the orders of the vessel's captain. The Jones Act's tort remedies are, as noted above, "informed" by common law tort concepts, but they must also yield to the "'necessities of the sea.'" (*Societa, supra,* 31 Cal.3d at p. 459, quoting *United States v. W.M. Webb, Inc.* (1970) 397 U.S. 179, 191.) "The exigencies and realities of life at sea require that there be a rigid chain of command aboard a ship." (*Thames*

14

*Shipyard & Repair Co. v. United States* (1st Cir. 2003) 350 F.3d 247, 276 (*Thames Shipyard*).) Were we to adopt a rule that imposed a duty upon a vessel's passengers to take actions inconsistent with the orders of her captain, we would effectively be imposing a duty to mutiny. (46 U.S.C. § 11501(4), (5) [authorizing confinement and docking of wages for "disobedience to a lawful command at sea"]; Harb. & Nav. Code, §§ 803, 804 [authorizing confinement and "other reasonable corporal punishment" for disobeying "lawful commands" of a vessel's master]; *Rees v. United States* (4th Cir. 1938) 95 F.2d 784, 792 ["there must be a captain in charge of a ship, and the captain's word is taken and it must be acted on, not only by the crew, but by passengers . . ."].) Not only would such a duty place passengers in the untenable position of having to choose between mutiny or tort liability, it would also be manifestly "unwise" to require a vessel's passengers "to interfere with the chain of command" in a way that could "forc[e] the [ship's] master to succumb to the orders and directions" of "officious meddl[ers]" rather than defer to his or her experience and judgment as a mariner. (*Thames Shipyard*, at p. 276.)

For these reasons, we independently agree with the trial court that plaintiff was neither an employee nor "borrowed servant" of Asylum and that his Jones Act claim fails as a matter of law.[5]

---

[5] Because plaintiff is not Asylum's borrowed servant, we have no occasion to weigh on the split of authority regarding whether such a borrowed servant may proceed under the Jones Act against *both* his actual employer *and* the entity for which he is a borrowed servant. (Compare *McAllister*, *supra*, 337 U.S. at p. 791 ["only one person, firm, or corporation can be sued as

15

**B.** *Liability under maritime law*

1. *No duty to rescue as the general rule*

"In general, each person has a duty to act with reasonable care under the circumstances." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*); Civ. Code, § 1714, subd. (a).) However, a person generally "has no duty to come to the aid of another." (*Williams v. State of California* (1983) 34 Cal.3d 18, 23; *Regents,* at p. 619.) From this general rule flows the corollary that there is no "affirmative duty to rescue a vessel or person in distress." (*Korpi v. United States* (N.D. Cal. 1997) 961 F.Supp. 1335, 1346 (*Korpi*); *Hurd v. United States* (D.S.C. 2001) 134 F.Supp.2d 745, 771-772 (*Hurd*); *Wright v. United States* (N.D. Cal. 1988) 700 F.Supp. 490, 494 (*Wright*); *Gough v. U.S. Navy* (S.D. Cal. 2009) 2009 U.S. Dist. LEXIS 75589, *11-*12; see generally, Rest.3d Torts, § 40, com. h, page 43 ["there is no general duty to rescue"]; Rest.2d Torts, § 314 ["'The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.'"].) Why do we have this decidedly non-altruistic and "counterintuitive" general rule? Because the "'anglo-saxon thought'" that forms the seabed of our tort law rests on an "'attitude of extreme individualism.'" (*Soldano v. O'Daniels* (1983) 141 Cal.App.3d 443, 446; Rest.3d Torts, § 40, com. h, pp. 42-43.)

---

employer"] and *Glynn, supra,* 57 F.3d at p. 1497 ["there can be no more than one 'employer' for purposes of the Jones Act"] with *Guidry v. South Louisiana Contractors, Inc.* (5th Cir. 1980) 614 F.2d 447, 452 ["It may also be possible for a seaman to have more than one Jones Act employer."].)

### 2. *The pertinent exceptions*

Although, under the general rule set forth above, Asylum had no duty to rescue plaintiff by helping him get medical attention for his injuries, plaintiff urges that there are triable issues of fact as to whether three exceptions to this general rule apply.

#### a. Special relationship between the parties

A person has a duty to "assist or protect another" if "there is some relationship between [the two] which gives rise to a duty to act." (*Regents*, *supra*, 4 Cal.5th at p. 619; *Williams*, *supra*, 34 Cal.3d at p. 23; Rest.3d Torts, § 40, subd. (a) ["An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship."].)

A "special relationship" imposing a duty to act—and hence a duty to rescue—can arise from four different sources. First, a special relationship can inhere in the nature of the relationship itself, such as the relationships between (1) a common carrier and its passengers, (2) an innkeeper and its guests, (3) a person who owns or possesses land and persons coming onto the land, (4) an employer and its employees who, while at work, are in imminent danger or rendered helpless by injury or illness, (5) a school and its students, (6) a landlord and its tenants, (7) a custodian and those within its custody, and (8) a manufacturer or supplier of goods and the buyer or user of those goods. (Rest.3d Torts, § 40(a) [listing first seven]; *Regents*, *supra*, 4 Cal.5th at p. 620; *Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1203 (*Seo*) [listing eighth].) Second, the parties may create a special relationship by entering into a contract imposing a "contractual duty" to act. (*Johnson v. The Raytheon Co., Inc.*

17

(2019) 33 Cal.App.5th 617, 634; *Seo*, at p. 1203; *Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 438-439 (*Suarez*); *Stockberger v. United States* (7th Cir. 2003) 332 F.3d 479, 481 (*Stockberger*).) Third, a special relationship entailing a duty to act can be created "by a statute or government regulation." (*Seo*, at p. 1203; *Suarez*, at p. 438.) Lastly, a special relationship creating a duty to act can arise from one party's conduct in creating the very peril that necessitates aid and intervention. (*Williams*, *supra*, 34 Cal.3d at p. 23; *Rodrigue v. United States* (D. Mass. 1991) 788 F.Supp. 49, 51.)

The undisputed facts establish that no special relationship exists between Asylum and plaintiff. No special relationship inheres in the relationship between a production company and the persons who merely consent to being filmed for a reality TV show, at least when those persons are not otherwise hired, employed or compensated by that company. The sole contract between Asylum and plaintiff was the *Appearance Release Form*, the sum total of which granted Asylum permission to "tape and photograph" plaintiff and to "exculsive[ly] own[] . . . the results and proceeds of such taping." That form did not impose any duty upon Asylum to aid plaintiff. Plaintiff cites no statute or regulation requiring Asylum to aid him. And the medical peril giving rise to the need for rescue was caused by plaintiff's self-inflicted injuries, not anything that Asylum did.

Plaintiff offers four reasons why he and Asylum were in a special relationship that obligated Asylum to rescue him.[6] First,

---

[6] Plaintiff originally offered a fifth reason why he was in a special relationship based on Asylum's alleged "ownership" of *The M/V Black Jack IV* (see *Naglieri*, *supra*, 93 F.Supp.2d at p. 175;

18

he argues that Asylum has a contract-based duty to rescue him because he signed Asylum's *Appearance Release Form*. We reject this argument because, as noted above, a special relationship arises by contract only if the contract itself imposes a duty to rescue, and here it does not. Contrary to what plaintiff suggests, the mere fact that the parties have signed some contract at some point in the past does not, without more, give rise to a contractual duty to aid.

Second, plaintiff asserts that he and Asylum are not complete strangers—and hence have what he calls a "'human relationship'"—that gives rise to a duty to rescue. We disagree. Although the list of special relationships enumerated in the Restatement is not meant to be "exclusive" (Rest.3d Torts, § 40, com. o, p. 47), it does not create a special relationship between people merely because they have interacted at some point in the past. Were that the case, the special relationship exception would in large part swallow the no-duty-to-rescue rule.

Third, plaintiff argues that Asylum profited from his misfortune by filming his injury, its treatment on *The M/V Black Jack IV* and his subsequent rescue on *The M/V Hullraiser*, and treating his personal tragedy as the dramatic denouement of its reality TV show. This is not enough to create a special relationship giving rise to a duty to rescue. Benefit to one party is, at most, a relevant factor; it is not a sufficient one. (E.g., *Regents*, *supra*, 4 Cal.5th at p. 621 [examining "benefit" to the "party [to be] charged with a duty of care"]; *Dzung Duy Nguyen v.*

---

*Abogado v. International Marine Carriers* (S.D. Texas 1995) 890 F.Supp. 626, 633, fn. 4), but he abandoned that argument in his reply brief.

19

*Massachusetts Institute of Technology* (Mass. 2018) 479 Mass. 436, 452 ["financial benefit to the defendant" is one "factor" to consider in deciding whether it had a duty to prevent suicide].) What is more, recognizing a duty in the context of this case would turn every production company employee into a person obligated to rescue every unpaid "extra" and every "reality TV personality" on every set. Tort law is elastic, but it cannot stretch this far without breaking.

Lastly, plaintiff posits—as he did above—that Asylum should be deemed to be in a special relationship with him because it selected him to be on *The M/V Black Jack IV* because of his relative inexperience; for the same reasons noted above, this position finds no support in the evidence adduced in this case.

b.      Voluntary efforts to rescue

Even if a person has no pre-existing duty to provide aid or attempt a rescue, he or she can be liable in tort if (1) the person voluntarily "undertakes to perform acts to rescue or aid those in distress," and (2) his or her efforts to rescue (a) are reckless or wanton (that is, grossly negligent), (b) are negligent and place the plaintiff in a worse position (by increasing the risk of harm to him) than if there had been no rescue effort, or (c) prompt the plaintiff to detrimentally rely on the rescue effort. (*Berg v. Chevron USA, Inc.* (9th Cir. 1985) 759 F.2d 1425, 1430 [setting forth exceptions (a) and (b)]; *Hurd, supra*, 134 F.Supp.2d at p. 772 [same]; *Korpi, supra*, 961 F.Supp. at p. 1347 [same]; *Frank v. United States* (3d Cir. 1957) 250 F.2d 178, 180 [setting forth exceptions (b) and (c)]; *Sagan v. United States* (6th Cir. 2003) 342 F.3d 493, 498 [same]; *Williams, supra*, 34 Cal.3d at p. 23 [same]; *McGee v. Chalfant* (Kan. 1991) 248 Kan. 434, 438 [same]; *Ocotillo W. Joint Venture v. Superior Court* (Ariz. 1992) 173 Ariz. 486,

488-489 (*Ocotillo*) [same]; *Rodrigue v. United States* (1st Cir. 1992) 968 F.2d 1430, 1434 [setting forth exception (b)]; *Furka v. Great Lakes Dredge & Dock. Co.* (4th Cir. 1985) 755 F.2d 1085, 1088 (*Furka*) [defining "reckless" or "wanton"]; see generally, Rest.2d Torts, § 323 ["gratuitous[]" "undertak[ing]" "to render services" to "protect[]" another gives rise to liability to that person if "his failure to exercise such care increases the risk of such harm" or "the harm is suffered because of the other's reliance upon the undertaking"]; Rest.2d Torts, § 324A [same, as to liability to third persons].)

As this standard makes clear, a volunteer's *ordinary* negligence in effectuating a rescue is not enough to render him liable in tort. "[T]he law accords [this] considerable latitude" to would-be rescuers for a reason. (*Grigsby v. Coastal Marine Service, Inc.* (5th Cir. 1969) 412 F.2d 1011, 1021 (*Grigsby*).) Such latitude "'encourage[s] the impulse to assist'" those in need by reducing the "threat of liability" should their altruistic impulses nonetheless result in a "clumsy rescue attempt." (*Hurd*, *supra*, 134 F.Supp.2d at p. 772; *Stockberger*, *supra*, 332 F.3d at p. 481.) A more forgiving standard of liability also acknowledges that emergencies necessitating rescue typically exist in "'the excitement and confusion of the moment,'" where "promptness may be prudence, and reflex may claim the seat of reason." (*Furka*, *supra*, 755 F.2d at p. 1088.) These considerations are particularly acute in the context of maritime law: The "perils of the sea"—in all its rage and glory—are legend, and they favor the application of the legal standard "'most hospitable to the impulses of man and law to save life and limb and property.'" (*Korpi*, *supra*, 961 F.Supp. at 1347; *Wright*, *supra*, 700 F.Supp. at

21

p. 494; accord, *Grigsby*, at p. 1022 ["[I]mpulsive action in the best tradition of the sea [gives a rescuer] [a] highly preferred status"].)

Even if we assume that Asylum undertook "to perform acts to rescue or aid" plaintiff, Asylum is not liable under the heightened negligence standard applicable to voluntary rescuers as a matter of law.  That is because there are no triable issues of material fact indicating that Asylum's rescue attempts were grossly negligent, that they placed plaintiff in a worse position than had Asylum done nothing, or that plaintiff detrimentally relied on anything Asylum said or did while attempting to get him medical attention.

Plaintiff musters six arguments in favor of his position that Asylum is nevertheless on the hook for what plaintiff asserts are its abortive rescue attempts.

First, plaintiff contends that there are triable issues of fact as to whether Asylum is liable to him because both the producer and cameraman aboard *The M/V Black Jack IV* promised him they would arrange for his evacuation by helicopter.  This might provide a basis for liability if plaintiff had relied to his detriment on their representations, but it is undisputed that he did not.  Instead, he also went directly to the captain to make his plea for a chopper.

Second, plaintiff asserts there are triable issues of fact as to Asylum's role in making the decision to evacuate plaintiff by rendezvousing with *The M/V Hullraiser* rather than by Coast Guard helicopter, a decision he claims was a negligent one.  However, and as discussed above, it is undisputed that Asylum at most offered Hans its input on how to proceed, and that Hans *ignored* the input by opting to rendezvous with *The M/V Hullraiser* rather than call the Coast Guard.  Thus, the factual

22

disputes that plaintiff points to regarding the internal debate among Asylum employees about how best to effectuate plaintiff's evacuation are not material because the fruit of that internal debate—its recommendation to call the Coast Guard—was unequivocally rejected by *The M/V Black Jack IV's* captain.

Third, plaintiff argues that there are triable issues of fact as to whether Asylum's decision to hire an EMT to accompany *The M/V Hullraiser* to pick up plaintiff was a negligent one because the EMT was not qualified to treat infections. However, even if we assume this decision was a negligent one, it is still not actionable as a matter of law because the resulting act did not place plaintiff in a worse position. In assessing whether a voluntary rescuer has placed the imperiled person in a worse position, the relevant test is """not whether the risk was increased over what it would have been if the defendant had not been negligent," but rather whether "the risk was increased over what it would have been had the defendant not engaged in the undertaking at all.""" (*Thames Shipyard*, *supra*, 350 F.3d at p. 261.) Thus, even if Asylum had been negligent in hiring an EMT (rather than a doctor), that decision did not put plaintiff in any worse position vis-à-vis the relevant alternative of not having *any* medical professional aboard *The M/V Hullraiser*.

Fourth, plaintiff asserts that Asylum's retention of an EMT *did* put him in a worse position because there is a triable issue of fact as to whether Asylum delayed *The M/V Hullraiser*'s departure by several hours—and hence delayed medical treatment to plaintiff's detriment—while Asylum wired the EMT with a microphone and made him sign a release form. Although the EMT certainly testified that it took Asylum more than three hours to sign a form and clasp a microphone to him, the EMT

23

never testified that *The M/V Hullraiser* was waiting on him to depart. Instead, the sole evidence on that question came from Buddy, *The M/V Hullraiser*'s captain, who unequivocally stated that he shoved off once *he* was ready to depart and that he "didn't wait for anyone." Thus, the undisputed facts show that no actions by Asylum delayed *The M/V Hullraiser*'s itinerary.

Fifth, plaintiff contends that there are triable issues of material fact as to whether Asylum's cameraman and producer "interfered" with the EMT's care of plaintiff as they traveled back to Galveston on the *M/V Hullraiser* after rendezvousing with *The M/V Black Jack IV*. Although the EMT offered self-contradictory testimony as to whether there was any interference, his confused testimony does not create any triable issue of fact because it is undisputed that any interference did not place plaintiff in any worse position. That is because the EMT did not have the antibiotics necessary to treat plaintiff. And, as noted above, the decision to hire an EMT itself did not place plaintiff in any worse position.

Lastly, plaintiff more globally asserts that the trial court misapplied the standards for evaluating whether to grant summary judgment by declining to view the evidence in the light most favorable to him and by labeling his evidence as speculation. We disagree. For the reasons set forth above, we have viewed the evidence through the proper prism and, like the trial court, conclude that many of plaintiff's arguments rest on speculation rather than evidence and that the evidence presented does not raise any triable issues of material fact.

c.     Taking charge of a "helpless" person

Even if a person has no pre-existing duty to provide aid or attempt a rescue, he or she can be liable in tort if (1) the person

24

voluntarily "takes charge" of a "helpless" person, and (2) he does not "exercise reasonable care to secure [the helpless person's] safety while within [his] charge." (Rest., Torts, § 324; Rest.2d Torts, § 324(a); *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes* (6th Cir. 1989) 891 F.2d 1199, 1208 (*Daughenbaugh*) ["One who voluntarily takes charge of a helpless person must exercise reasonable care for his welfare and safety."]; *Ocotillo*, *supra*, 173 Ariz. at p. 489; *Carson v. Adgar* (S.C. 1997) 326 S.C. 212, 218 (*Carson*).)

Plaintiff has not raised a triable issue of fact as to either element of liability.

(i)     Taking charge

Plaintiff has not adduced sufficient evidence to create a triable issue of fact as to whether Asylum "took charge" of him. To establish that a person has "taken charge" of another, that person must "'through affirmative action assum[e] an obligation or intend[] to render services for the benefit of another.'" (*Carson*, *supra*, 326 S.C. at p. 218.) Typically, a person takes charge of another person by taking physical custody of him (*Wakulich v. Mraz* (Ill. 2003) 203 Ill. 2d 223, 226-227, 245 [defendants gave plaintiff dangerous alcoholic beverage and decided to care for her when she passed out]; *Sung-Ho Hwang v. Grace Rd. Church* (E.D.N.Y. 2016) 2016 U.S. Dist. LEXIS 32824, *38-*39 [defendant restrained plaintiff on its property and did not seek medical care for his gangrene]) or by taking "responsibility for [his] overall safety" (*Hinson v. Black* (Ga. App. 2002) 257 Ga. App. 628, 631-632 (*Hinson*); e.g., *Downs ex rel. Downs v. Bush* (Tenn. 2008) 263 S.W.3d 812, 823 [defendant agreed to give incapacitated plaintiff a ride home and helped him get into bed of truck]; *Sarracino v. Martinez* (N.M. Ct. App. 1994)

25

117 N.M. 193, 194-195 [same]; *David v. Southern Farm Bureau Casualty Ins. Co.* (La. Ct. App. 1960) 122 So.2d 691, 692 [defendant agreed to take plaintiff to nearest hospital]; *Ocotillo, supra*, 173 Ariz. at pp. 487-490 [defendant took plaintiff's car keys because plaintiff was intoxicated, but then gave keys back to plaintiff]; *Shizuko Mita v. Guardsmark, LLC* (Wash. Ct. App. 2014) 182 Wash. App. 76, 88-89 [defendant allowed plaintiff to come into building out of the freezing cold, then released him back outside]).  However, a person does not "take charge" of another merely by making suggestions or giving "cursory assistance" short of assuming responsibility for his safety.  (E.g., *Carson*, at p. 218 [plaintiff must show that "'defendant did more than act'"]; *Hinson*, at pp. 631-632 [defendant helped drunken plaintiff who fell off of bar stool by getting her peanuts and suggesting she sit down; did not "take charge"]; *Byram v. Renehan* (M.D. Pa. 2011) 2011 U.S. Dist. LEXIS 141067, *4-*5, *13-*14 [defendant helped plaintiff who slipped on wet grass stand up; "cursory assistance" did not amount to "taking charge"]; *Freeman v. Busch* (S.D. Iowa 2001) 150 F.Supp.2d 995, 1001-1003 [defendant allowed plaintiff entry into dormitory, where another student watched over plaintiff; did not "take charge"].)

The undisputed evidence shows that Asylum neither took physical custody of plaintiff nor responsibility for his overall safety.  Plaintiff was in the physical custody of Hans (as captain of *The M/V Black Jack IV*) until he was handed off to Buddy (as captain of *The M/V Hullraiser*).  As captains of those vessels, Hans and Buddy were also responsible for plaintiff's overall safety.  (*Naglieri, supra*, 93 F.Supp.2d at p. 175; *Boudoin, supra*, 281 F.2d at p. 85.)

26

Plaintiff responds with three arguments.  He begins by pointing to the assurances of the two Asylum employees aboard *The M/V Black Jack IV* that they would arrange for his evacuation by chopper.  But this did not mean Asylum took charge of plaintiff because Hans remained firmly in charge when he *rejected* their input to call the Coast Guard for a helicopter.  Plaintiff next cites to Asylum's act of arranging for an EMT to be aboard *The M/V Hullraiser*.  But this also did not mean that Asylum took charge of plaintiff because Hans had made the decision to send for that vessel, Buddy was piloting that vessel, and Buddy transported plaintiff to the Galveston hospital once the vessel made landfall.  Because the EMT was unable to do anything beyond evaluate plaintiff's medical condition, Asylum's retention of the EMT was at best "cursory assistance."  Plaintiff lastly asserts that it is not *his* responsibility to identify what harm he suffered due to Asylum's substandard intervention because that is relevant to causation, not duty.  But this is a non-sequitur.  It is *plaintiff*'s burden to show that there is a triable issue of material fact as to whether Asylum took charge of him (*Carson*, *supra*, 326 S.C. at p. 218), and he has not carried that burden.

(ii)  Helpless person

Plaintiff has also not established that there is a triable issue of material fact as to whether he was a "helpless" person.  For these purposes, a person is "helpless" if he is "incapable of adequately taking care of himself," such as when he is "ill, drunk, or made helpless by the act of a third person, through his own fault or by a force of nature."  (Rest., Torts, § 324, com. b, page 877; *Daughenbaugh*, *supra*, 891 F.2d at p. 1208 [intoxicated person]; *Garofalo v. Lambda Chi Alpha Fraternity* (Iowa 2000)

27

616 N.W.2d 647, 655-656 [same]; *Reynolds v. Hicks* (Wash. 1998) 951 P.2d 761, 764 [same].) "[W]hether an individual is 'helpless' must be made within the context of each case." (*Ocotillo*, *supra*, 173 Ariz. at p. 656.) In the context of this case, plaintiff was—as a matter of law—not helpless. Although the condition of his hands was deteriorating (even to the point of making it difficult for him to get around the ship), plaintiff was not intoxicated, unconscious, or otherwise unable to express his intention and desire to be evacuated due to his medical condition. At bottom, plaintiff's argument boils down to the assertion that he is "helpless" because he was in need of rescue. But if, as plaintiff contends, a "helpless" person includes anyone in need of rescue, the heightened standard that limits tort liability for would-be rescuers would be displaced by the regular negligence standard applicable to those who take charge of "helpless" persons because anyone who attempts a rescue would necessarily "take care" of that person. Not only would that throw overboard all of the rules of liability applicable to would-be rescuers, it would also completely destroy the very incentive those more forgiving rules were carefully crafted to create—namely, the incentive to rescue on the high seas where throwing someone the proverbial and literal line can be the difference between life and death.

\*　　\*　　\*

In light of our analysis, we have no occasion to decide whether the liability release signed by plaintiff in the *Appearance Release Form* is an additional bar to recovery.

28

## DISPOSITION

The judgment is affirmed. Asylum is entitled to its costs on appeal.

<u>CERTIFIED FOR PUBLICATION</u>.


_____, J.
HOFFSTADT

We concur:


_____, P.J.
LUI


_____, J.
CHAVEZ

29